**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| JOHN DOE<br>c/o Engel and Martin, LLC<br>5181 Natorp Blvd., Ste. 210<br>Mason, Ohio  45040 | Case No.    **1:15-cv-600**<br><br>Judge:<br><br>VERIFIED COMPLAINT AND JURY<br>DEMAND |
| Plaintiff | |
| v. | |
| UNIVERSITY OF CINCINNATI<br>2600 Clifton Avenue<br>Cincinnati, OH 45220 | |
| DANIEL CUMMINS<br>Suite 745<br>Steger Student Life Center<br>Cincinnati, Ohio  45221 | |
| and | |
| DEBRA MERCHANT<br>Van Wormer Hall,<br>2614 McMicken Circle<br>Cincinnati, OH 45221 | |
| Defendants | |

**INTRODUCTION**

1. Plaintiff John Doe brings this action for a declaratory judgment, violation of 42 U.S.C. §1983, violation of Title IX, and injunctive relief

2. This case arises out of the decision of the Defendants to proceed with disciplinary proceedings against the Plaintiffs in violation of the Plaintiff's Constitutional and federal statutory rights.

3. This case involves some of the same facts and allegations as in Case No. USDC, S.D. Ohio 1:14-cv-00404-SJD. That case was dismissed by Order of the Court.

4. This case also involves some of the same facts and allegations as in Hamilton County Common Pleas Court Case No. A1406907. That case was voluntarily dismissed without prejudice.

**PARTIES**

5. Plaintiff John Doe is a current student at the University of Cincinnati. He has a principal residence in [OMITTED].

   a. John Doe is senior who needs one semester to finish his degree.

   b. John Doe is a member of the UC football team.

   c. John Doe seeks to proceed anonymously. Due to the nature of the allegations in this case, disclosure of their names would be highly prejudicial. This case also involves education records which are generally protected from public disclosure by FERPA.

6. Defendant University of Cincinnati ("UC") is a public university created by the Ohio Legislature. UC has a principal place of business at 2600 Clifton Avenue, Cincinnati, OH 45220. Under Ohio Revised Code 3361.01, the University of Cincinnati's Board of Trustees is the governing body of the University of Cincinnati.

7. Defendant Daniel Cummins is the Assistant Dean of Students/Director of the Office of University Judicial Affairs for UC. He has a principal place of business at Suite 745 Steger Student Life Center, Cincinnati, Ohio 45221-10193.

   a. Defendant Cummins is sued in his official capacity for declaratory and injunctive relief, and in his personal capacity for damages.

2

    b. On information and belief, Cummins is acting under regulations set forth in the Ohio Administrative Code, as well as the policies, procedures, and practices of UC.

    c. Defendant Cummins has responsibility responsible for the administering and operating aspects of the UC Student Code of Conduct and Judicial System.

8. Defendant Debra Merchant is the Vice President for Student Affairs for UC.  She has a principal place of business at Van Wormer Hall,  2614 McMicken Circle, Cincinnati, OH 45221

    a. Defendant Merchant is sued in her official capacity for declaratory and injunctive relief, and in her personal capacity for damages.

    b. On information and belief, Merchant is acting under regulations set forth in the Ohio Administrative Code, as well as the policies, procedures, and practices of UC

    c. Defendant Merchant has responsibility responsible for the administering and operating aspects of the UC Student Code of Conduct and Judicial System.

## JURISDICTION AND VENUE

9. This case arises, in part, under the United States Constitution and 42 U.S.C. §§ 1983 and 1988. Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

10. This case arises, in part, under the laws of the United States, specifically United States, specifically Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq. Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

11. The declaratory and injunctive relief sought in this matter is authorized by 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and Federal Rules of Civil Procedure 57 and 65.

12. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391.  The defendants are residents of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

**A.     The UC Code of Student Conduct**

13. After years of criticism for being too lax on campus sexual assault, colleges and universities are relying on Title IX to crackdown on alleged perpetrators.  Unfortunately, this crackdown has gone too far.  Problems include: accused students effectively are presumed guilty; instead of requiring accusers to prove they were assaulted, the accused students have to prove they had consent; and schools apply the very lowest standard of proof — preponderance of the evidence.

14. On April 11, 2011, the U.S. Education Department's Office of Civil Rights sent a  "Dear Colleague" to colleges and universities.

    a.  The Dear Colleague Letter indicated that, in order to comply with Title IX, colleges and Universities must have transparent, prompt procedures to investigate and resolve complaints of sexual misconduct.

    b.  Most notably, the Dear Colleague Letter required schools to adopt a relatively low burden of proof—"more likely than not"—in cases involving sexual misconduct, including assault. Several colleges had been using "clear and convincing," and some, like Stanford, applied the criminal standard, "beyond a reasonable doubt."

    c.  The Dear Colleague Letter states that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing.

    d.  The Dear Colleague Letter, while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy.

    e.  The Dear Colleague Letter states that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student.

    f.  After the Dear Colleague Letter was published, many schools changed their sexual assault and sexual harassment policies and procedures.

4

15. The Federal Government, through the Department of Education, Office of Civil Rights, has been pressuring colleges and universities to aggressively pursue investigations of sexual assaults on campuses.

    a. The Dear Colleague letter was a step in the increased enforcement of Title IX on college and universities. NPR described the Dear Colleague Letter as the government's "first warning shot." Source: *How Campus Sexual Assaults Came To Command New Attention*, NPR, August 12, 2014.

    b. The Washington Post reported in March 2015 that the Office of Civil Rights was seeking to hire up to 200 more investigators.

    c. In May 2014, the federal Department of Education disclosed for the first time the names of colleges — 55 in all, including Hobart and William Smith — under investigation for possibly violating federal rules aimed at stopping sexual harassment.

    d. The Federal government, at last report, is investigating at least 129 schools for possible Title IX violations, including notable schools such as UC Berkeley, Stanford, Harvard, Brown University, Columbia University, Cornell University, Dartmouth College, Johns Hopkins University, the University of Chicago and many top state universities.

    e. The Department has negotiated settlements with many schools. These settlement often require significant concessions from the schools in the process used to adjudicate allegations of sexual assault and sexual harassment on campus.

    f. In February 2014, Catherine E. Lhamon, the assistant secretary of education who heads the department's Office for Civil Rights, told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents suggested afterward that there were

"crisp marching orders from Washington." Source: *Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases*, Chronicle of Higher Education, February 11, 2014.

g. Lhanon was quoted in the LA Times stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward." David G. Savage and Timothy M. Phelps, *How a little-known education office has forced far-reaching changes to campus sex assault investigations,* LA Times August 17, 2015.

16. Schools are scared of being investigated or sanctioned by the Department of Education.

a. The Federal government has created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." Source: *Presumed Guilty: College men accused of rape say the scales are tipped against them,* Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."

b. Lhamon told a national conference at Dartmouth in the summer of 2014, "I will go to enforcement, and I am prepared to withhold federal funds." Source: *How Campus Sexual Assaults Came To Command New Attention*, NPR, August 12, 2014. In that same article, Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I

think." She explained that schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead.

c. In June 2014, Lhannon told a Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She further told the Committee:

> If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. To revoke federal funds—the ultimate penalty—is a powerful tool because institutions receive billions of dollars a year from the federal government for student financial aid, academic resources and many other functions of higher education. OCR has not had to impose this severe penalty on any institution recently because our enforcement has consistently resulted in institutions agreeing to take the steps necessary to come into compliance and ensure that students can learn in safe, nondiscriminatory environments.

d. Robert Dana, dean of students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it." Source: *Some Accused Of Sexual Assault On Campus Say System Works Against Them*, NPR, September 3, 2014.

17. Probably the best and most obvious example of the pressures faced by schools comes from Ohio State University.

a. In July 2014, OSU fired its marching band director, Jonathan Waters, after a school investigation that found "sexualized" culture among band members.

b. Before this, OSU had been on the Education Department's list of colleges and universities that were being investigated for Title IX violations. After the school fired Waters, Ohio State was removed from the list as a result of an agreement between the school and the Department of Education.

c. The Department of Education cited the firing of Waters as one of the reasons it stopped investigating the school. "This agreement, and The Ohio State University's recent response to the culture within the marching band, set clear and vitally important expectations for a community-wide culture of prevention, support, and safety," said Assistant Secretary of Education for civil rights, Catherine E. Lhamon.

18. UC has felt the same pressures as other schools. A UC spokesperson recently explained the impossible position of UC. The spokesperson told the New York Post "college campuses are expected to serve as prosecutors, defense attorneys, judges, juries and courts of appeals all in one." Source: Andrea Peyser, *'Rape culture' leads to manhunts on campus*, NY Post, August 11, 2014.

19. UC has adopted certain policies and procedures for the investigation and adjudication of alleged violations of Title IX. These policies and procedures are available at http://www.uc.edu/titleix/policies-procedures.html and are incorporated herein. These procedures include the following:

a. Within seven days of the filing of a complaint, a Deputy Title IX Coordinator or designee will generally initiate a meeting with the respondent. During this meeting, the respondent will receive notice of the complaint allegations, a copy of the university's Title IX policies and procedures, and information about the Title IX process. The respondent also will be provided an opportunity to discuss the nature of the complaint allegations.

b. Within 14 days of the filing of a complaint, a Deputy Title IX Coordinator or designee will begin interviewing witnesses, as appropriate, and review relevant evidence. The complainant and the respondent will have an equal opportunity to provide documents and witnesses during the investigation and adjudication of the complaint.

c.   At the conclusion of the investigation, the Deputy Title IX Coordinator will prepare an interim investigatory report for review by the complainant and respondent. The complainant and respondent will be provided an equal opportunity to review, ask written questions about, and comment in writing on the report. Written input from the complainant and respondent will be incorporated into the report. If necessary, the Deputy Title IX Coordinator will conduct additional investigation prior to finalizing the report.

d.   Adjudication of complaint under this procedure will take place as set forth in the UC Student Code of Conduct.  The complainant and respondent have equal rights to file an appeal.

e.   UC  applies the preponderance of the evidence or "more likely than not" standard in investigating, adjudicating, and resolving complaints of sex discrimination, including allegations of sexual harassment or violence.

20. The UC Title IX Policy defines consent as follows:  "Consent is informed, freely given, mutual, and can be withdrawn at any time. A person cannot give consent if he or she is mentally or physically incapacitated or impaired such that the person cannot understand the fact, nature or extent of the sexual situation; this includes impairment or incapacitation due to age, alcohol or drug consumption, or being asleep or unconscious. . . ."

21. Under the UC Title IX Policy, so called "interim measures" are available to a complainant solely by the making of a report of sex discrimination prior to the resolution of a complaint.  These interim measures often include restrictions and sanctions on the respondent.  The interim measures are often imposed prior to any investigation and without any determination as to the reliability of the allegations.  The respondent is not given any opportunity to seek a review or appeal of these interim measures.

22. The UC Title IX policy incorporates "a *full* list of on- and off-campus resources for individuals who have experienced sex discrimination, including sexual misconduct (emphasis in original)." The UC Title IX Policy does not include a list of resources for people accused of violating the Policy.

23. On August 15, 2012 UC Adopted a Policy Statement on Sexual Violence. The Policy Statement is available at:

   http://www.uc.edu/content/dam/uc/sas/docs/Policy_Statement_on_Sex_Offenses.pdf and is incorporated herein.

   a. The Policy Statement provides that "Allegations of sexual assault will be processed according to the disciplinary procedures described in the Student Code of Conduct if the accused is a student . . ."

   b. The Policy statement incorporates definitions of key terms, such as "rape" and "Sexual imposition" form Chapter 2907 of the Ohio Revised Code.

24. The UC Code of Student Conduct governs student behavior and provides for sanctions for violations. Revisions to the Policy were adopted in 2012 in part, on information and belief, as a direct response to pressure from the Department of Education. A copy of the current policy is attached as Exhibit A and is incorporated herein.

   a. The UC Code of Conduct is codified in the Ohio Administrative Code. OAC 3361:40-5-04.

   b. The UC Code of Conduct provides that it is not a contract between UC and students, and UC reserves the right to change the procedural protections in the UC Code of Conduct "at any time during the student's term of enrollment." UC Code of Conduct § A(1)(e).

10

    c. Pursuant to OAC 3361:40-5-03, UC is required to employ procedures that are "consistent with both the customs of a free society and the nature and function of an institution of higher learning."

25. The UC Code of Conduct provides procedures that are supposed to be employed to resolve allegations of student violations.

26. UC applies different rules to allegations of sexual assault or sexual harassment than to other alleged violations of the UC Code of Student Conduct.

    a. Allegations of sexual assault or sexual harassment are investigated by Defendant Cummins or another "Title IX" administrator.

    b. UC begins disciplinary proceedings against students accused of sexual assault or sexual harassment prior to the completion of an investigation.

    c. UC employees, including Defendant Cummins, have stated that UC attempts to comply with its interpretation of the Dear Colleague Letter.

27. A student who is accused of sexual assault or sexual harassment is entitled to an Administrative Review Committee Hearing ("ARC Hearing") prior to the imposition of discipline. However, in practice UC often imposes restrictions and punishments – sometimes referred to as "interim measures" – based solely on an allegation without allowing for any hearing or even conducting any investigation.

28. A number of these provisions of the UC Code of Conduct concerning the ARC Hearings for students accused of sexual assault or sexual harassment raise significant due process and self-incrimination concerns, including:.

    a. UC does not undertake a full, complete and impartial investigation prior to the institution of disciplinary proceedings for allegations of sexual assault or sexual harassment

b. A student is permitted to have an attorney present at the hearing, but the attorney may "not actively participate as a spokesperson or vocal advocate in the hearing."

c. The hearing board may review written statements without providing the student with the opportunity for cross-examination.

d. A student may cross-examine an accuser and adverse witnesses only through the use of written questions. However, the hearing chair has the right to review and determine which written questions will be asked. This process does not allow for effective cross-examination, particularly through the use of follow-up questions and impeachment through prior inconsistent statements.

e. A student does not have ability to compel other students or UC employees to attend the hearing.

f. UC does not place the burden of proof at an ARC Hearing on the University or the complainant.

    i. Students are not "innocent until proven guilty."

    ii. In effect, this means that a student must prove his or her innocence if accused of sexual assault or sexual harassment. In an email to one student accused of sexual misconduct, Defendant Cummins explained, "a preponderance of the evidence burden of proof applies. Neither the complainant nor the respondent bears this burden of proof in an ARC hearing." In another correspondence, a UC administrator wrote, "Neither party has any burden of proof. Instead, the ARC uses the hearing to investigate what happened and then makes a finding based on the preponderance of evidence."

29. Sanctions for violations of the UC Code of Student Conduct range from a reprimand to suspension or dismissal from UC. Sanctions may also include restrictions on the right of access to campus facilities, restitution, and a psychological or psychiatric evaluation.

30. At UC, administrators and hearing panel members have been trained that the prevention of sexual misconduct is primary concern following the receipt of the "Dear Colleague Letter." Notably, the same administrators have not received comparable training about the importance of protecting the due process rights of the accused.

   a. On October 6, 2011, the head of the UC Women's Center provided training to hearing panel members.

      i. This training was biased, as it was presented by the head of a campus organization responsible for aiding alleged victims of sexual assault. The training included statistics about the prevalence of sexual assaults on campus and included topics irrelevant to the decision making process, such as "Sexual assault is about POWER & CONTROL"



ii. The training also included descriptions of the "Profile of a sexual Assault Victim" and the "Profile of a Sex Offender."  These "profiles" do not serve to aid in the adjudicatory process but, instead, serve to encourage panel members to find an alleged sex offender responsible before he can commit another sexual assault.



iii. The training misstated the UC Code of Student Conduct for consent, claiming incorrectly that consent for sexual activity must be "Ongoing [and] Verbal." In fact, the UC Policy in effect for John Doe, consistent with Ohio law, does not require verbal consent. *See UC Policy Statement on Sex Offenses* (Effective August 15, 2012, with prior effective dates in 2011 and 2008.).



iv. At no time did the training include any discussion of due process concerns or the idea that those accused of violating the Code of Conduct are presumed to be not guilty.

v. This training was repeated in 2012.

b. On an unspecified date the hearing panel members received a training titled, "Sexual Assault & Response. Preventing Sexual & Gender Based Violence."

i. This training had the purpose and effect of informing panel members that they had a job to prevent sexual assault on campus, not to fairly and impartially adjudicate allegations of misconduct.

ii. This training included the discredited statistic that "1 in 4 college women" will be the victim of sexual assault during her time in college.



iii. Similar to the training provided by the UC Women's Center, this training also mis-stated the definition of consent at UC pursuant to the Sexual Misconduct Policy. The training told panel members that consent must be "verbal" and "on-going." In fact, the UC Policy in effect for John Doe, consistent with Ohio law, does not require verbal consent. *See UC Policy Statement on Sex Offenses* (Effective August 15, 2012, with prior effective dates in 2011 and 2008.).



iv. At no time did the training include any discussion of due process concerns or the idea that those accused of violating the Code of Conduct are presumed to be not guilty.

c. On June 2, 2014, administrators from public colleges and universities in Ohio attended training from the Ohio Board of Regents. This training included presentations titled "Context and theory of change" and "Creating Safer Campuses in Action." The OU administrators heard presentations from the Director of the Ohio Alliance to End Sexual Violence, the Rape Prevention Coordinator of the Ohio Department of Health, and the

Prevention Director of the Cleveland Rape Crisis Center. No presentations were made by any attorneys or others with the responsibility of ensuring that students accused of sexual misconduct receive due process.

d. A training session, entitled, "Topic: Policies & Procedures and Fact Finding" is, on information and belief, provided to hearing panel members. This training never suggests that students are presumed to be innocent until proven guilty. In fact, the training includes a slide featuring a "Far Side" cartoon suggesting that goal of hearing panel members is to impose discipline on students who will deny "accountability"



e. On or about May 14, 2015, UC administrators and hearing panel members attended training from Ballard Spahr titled, "Considerations in Adjudicating Sexual Misconduct Allegations." This training included the following slide, which suggests that due process includes, inter alia, the opportunity to question the other side and the presumption of innocence.

31. In practice, the UC system is biased against those accused of misconduct, thereby preventing students from having a full and fair opportunity to defend against these charges.

   a. On information and belief, high-ranking administrators at UC are determined to find students accused of misconduct responsible in order to "look good" for the Department of Education.

   b. On December 28, 2011, UC published a "Resource Guide [for] Student Survivors of Sexual Assault." The Resource Guide was published by Defendant's Cummins' Office, and Defendant Cummins is mentioned prominently in the document. The Resource Guide illustrates the bias inherent in the UC system by failing to mention the due process rights of those accused of sexual assault.

      i. In the document, persons who make accusations are considered to be "survivors" and the veracity of their accusation is not questioned. The consistent use of the term "survivor" implies that UC has pre-decided all claims of alleged sexual assault.

20

        ii.  In contrast, the Department of Education, Office of Civil Rights uses the more neutral terms, "complainant" and "alleged perpetrator."

c.  Defendant Cummins and other allegedly neutral investigators and fact-finders at UC often act as advocates for those who claim to be victims, rendering any investigation biased.

        i.  Cummins and other UC employees advocate for students who make allegations of sexual assault with faculty members in order to obtain accommodations in the form of changes in homework deadlines, grades, class, schedules, and examination schedules.

        ii.  Cummins and other UC employees often schedule ARC Hearings without actually conducting any investigation.

        iii.  Cummins and other UC employees make no effort to obtain and review any physical evidence; do not attempt to interview any witnesses or obtain any evidence that might corroborate the alleged victims' version of the events or contradict the statements provided by the alleged victims. Instead, Cummins and other UC employees reach investigatory conclusions by relying heavily on hearsay statements from the friends of the alleged victims.

        iv.  Cummins and other UC employees do not include information in investigative reports that is favorable to those accused of sexual assault.

        v.  High-ranking UC employees have attempted to interfere with investigations of allegations of sexual assault being conducted by the UC Police.

32. The ARC Hearing Panels for allegations of sexual assault or sexual harassment is often composed of biased members.

a. On information and belief, members of the ARC Hearing Panel are sometimes seeking to pursue a political agenda. This is demonstrated by aggressive questioning of those accused of sexual assault, in contrast to the sympathetic questions of the alleged victims.

b. Members of the ARC Hearing Panel have been requested to assist in obtaining academic accommodations for alleged victims prior to the Hearing.

c. The ARC Hearings Panels receive biased training aimed at encouraging findings of responsibility even when insufficient or unreliable evidence is presented. In a number of training sessions, the concept of "protecting the rights of the accused" is presented as part of a "values exercise" along with other concepts and, even is presented with a question mark. In other training sessions, the idea that a person is innocent until proven guilty is not even included.

33. A review of the recent history of ARC Hearing Panels, obtained through a public records request, shows that it is nearly impossible for a student to be found not responsible. In other words, if a student is accused of sexual misconduct, it is almost certain that the student will face discipline.

a. UC provided records for nine alleged violations of the Sexual Misconduct Policy that were presented to an ARC Hearing Panel, aside from the cases against John. (An additional record, involving a 2013 incident, did not indicate a result.)

   i. In *all nine cases* presented to the ARC Hearing Panel, the respondent was found responsible.

   ii. Six of the nine cases involved allegations of sexual conduct without the consent of the alleged victim. In all six cases, the hearing panel, on information and belief, reviewed an investigative report prepared by Defendant Cummins.

      iii.   In six of the cases UC considered an appeal. In four of the cases the appeal was rejected. In two of the cases the matter was sent back for a new hearing; in these cases the student was ultimately found responsible and a further appeal was denied.

b. The cases are summarized here:

| UC Report No. | Date | Brief Description | ARC Hearing | Result | Appeal | Final Result |
|---|---|---|---|---|---|---|
| 1 | 2012 | Sexual Contact without consent. Other party impaired due to alcohol | 2012 | Responsible | 2012 (Rachel Jay Smith) | Dismissal |
| 2 | 2011 | Sexual Contact without consent. Other party impaired due to alcohol | 2012 | Responsible | 2012 (Rachel Jay Smith) | Dismissal |
| 6 | 2010 | Sexual Contact without consent. Other party impaired due to alcohol | 2012 | Responsible | 2012 (Rachel Jay Smith) | Dismissal |
| 14 | 2012 | Sexual Contact without consent. Other party impaired due to alcohol | 2012 | Responsible | | Probation |
| 16 | 2012 | Sexual Contact without consent. Other party impaired due to alcohol | 2012 | Responsible | 2012 (Rachel Jay Smith) | Dismissal |

| 9 | 2013 | Sexual Contact without consent | 2013 | | Dismissal |
| 29 | 2013 | Sexual Contact without consent | | | |
| 27 | 2011 | Sexual Contact without consent. Other party impaired due to alcohol. | | | Suspension |
| 31 | 2014 | Sexual Contact without consent. Other party impaired due to alcohol | 2014, 2014 | 2014 (Rachel Ray Smith) | Responsible. Student graduated. |
| 30 | 2014 | Sexual Contact without consent. Other party impaired due to alcohol and drugs | 2013, 2014 | 2014 (Rachel Ray Smith) | Suspension |

c. A 2012 case illustrates how difficult it is for a student accused of sexual misconduct to be found responsible by the ARC Hearing panel. In that case, the student was alleged to have had sex with a student who was unable to consent because she was intoxicated. The student presented the ARC Hearing Panel with four sworn affidavits stating that the alleged victim was not intoxicated. The ARC Hearing Panel apparently ignored this evidence and still fund the student "responsible" and imposed disciplinary sanctions.

d. UC disclosed a total of 32 separate matters. In only 4 of the 32 cases was a student found "not responsible." None of those cases concerned "serious" matters or allegations of sexual abuse. Three of the "not responsible" findings related to a dispute

24

in the dorm over personal belongings, and one involved the driver of a van when the passenger allegedly directed a sexual remark to a passing female.

34. Students who make allegations of sexual assault or sexual harassment obtain accommodations in the form of changes in homework deadlines, grades, class, schedules, and examination schedules.

    a. These accommodations create a significant incentive for students to fabricate allegations of sexual assault.

    b. These accommodations create a significant incentive for students to continue to pursue allegations of sexual assault even if the evidence does not support the allegations.

    c. These accommodations are not disclosed to the ARC Hearing Panel, even though the accommodations are relevant to the credibility of the testimony.

35. On information and belief, UC "advocates" spend hours helping alleged victims of sexual assault prepare for ARC Hearings. No such accommodations or assistance have been offered in any meaningful way to those accused of sexual assault in the past. Recently, UC has stated that accused students may obtain an advisor from UC, although that the student must obtain that advisor through the same Title IX coordinator who is responsible for investigation the allegations against the student.

36. A review of the recent history of ARC Hearing Panels, obtained through a public records request, shows UC has a pattern and practice impossible for a student to be found not responsible. In other words, if a student is accused of sexual misconduct, it is almost certain that the student will face discipline

37. UC attempts to prevent those accused of sexual assault or sexual harassment from putting forward a meaningful defense by limiting their ability to prepare for the hearings.

    a. On information and belief, UC often provides students accused of sexual assault with less than three days to obtain all documents, testimony or other evidence that they wish to present at the hearing.

    b. UC often restricts the ability of students accused of sexual assault to obtain copies of statements and other evidence to be used against the student.

    c. UC restricts the ability of students to record hearings, even though Ohio law specifically permits such recordings.

38. The ARC Hearings are nothing more than mock hearings in which the principles of law and justice are disregarded or perverted. The ARC Hearings are characterized by irresponsible, unauthorized, or irregular status or procedures in which students are prevented form putting forth a meaningful defense.

39. The ARC Hearing Panels approach the ARC Hearings with the foregone conclusion that the student accused of sexual assault will be found responsible.

    a. The ARC Hearings Panels often rely on unreliable hearsay evidence.

    b. The ARC Hearing Panels prohibit from effective cross-examination of the complainants and witnesses. All questions must to be submitted through the Chair of the ARC Hearing; no follow-up questions are permitted.

40. On information and belief, Defendant Cummins orchestrates many of the actions of the ARC Hearing Panels.

41. Although students have a right to appeal the decision of the ARC Hearing Panel, the UC Code of Conduct strictly limits the permissible grounds for appeal.

42. Any appeal by students accused of sexual assault or sexual harassment is futile because of the bias inherent in the UC system.

a.  Even if an appeal is initially successful, the imposition of discipline is inevitable because of the bias inherent in the system.

b.  If a matter is reversed on appeal, UC may appoint the same ARC Hearing Panel to review the matter, even though members of the Hearing Panel have already reached a decision or been exposed to improper evidence.

c.  Requiring students to prove, because of the improper shifting of the burden of proof, that they have not committed a sexual assault or engaged in sexual harassment makes any new hearing futile because it is often difficult to prove a negative.

d.  Historically, this has been shown to be accurate.

 i.  In response to a public records request, UC was unable to produce a single example of a case where a student, following an appeal, was ultimately found "not responsible."

 ii.  In upholding penalties, the appeal administrator in a number of cases referred to the Department of Education crackdown on schools to justify harsh penalties such as the dismissal of students.

43. The ARC Hearing Panel, as an administrative body, is not permitted under Ohio law to consider the constitutionality of the UC Student Code of Conduct.

**The Facts Involving John Doe**

44. John Doe engaged in consensual sexual conduct with another UC student, Jane Roe, on or about February 26, 2015.

a.  John Doe had made contact with Jane Roe on Tindr, a dating app known for facilitating causal sex.

b. Jane Roe claimed that she had texted John Doe that she was not going to have sex with him. She allegedly told a UC detective she texted, "I'm just telling you I'm not going to have sex with you."

   i. This likely refers to a text she sent stating, "Just letting you know I don't sleep with people the first time around I have more respect for myself than that."

   ii. Jane Roe did not initially disclose the following exchange: But *later* there was this exchange which suggests that she anticipated having sex with John Doe:

   > JD: Just make sure you aren't too busy for me"
   > JR:"I can try to fit you in"
   > JD: "I try to fit in a lot of things."
   > JR: "Oh do you now. Shit I'm sure you have no problem"
   > JD: "Lol that's what you don't get, it doesn't fit."
   > JR: "Hahah you talk mad game hope you can live up."
   > JD: "Lol just hope you could keep up [Jane Roe] that's all I hope for. I love talking shit."
   > JR: " . . . don't worry about me I can take a dick to put it bluntly."

c. Jane Roe came over to John Doe's apartment. She admitted to investigators that she removed her own clothing and asked if John Doe had a condom.

45. After engaging in sexual conduct with John Doe, Jane Roe met her friends and then went out drinking. Jane Roe later contacted the police and said that she had been sexually assaulted and that John Doe had forced her to have sex against her will.

a. The police conducted an investigation. No charges were filed and John Doe was not even interviewed.

b. No physical evidence was found to support her claim.

   i. One photo of hickey on neck is consistent with them "making out"

   ii. She went to the hospital for a rape exam. Her medical records do not indicate any injuries.

46. Jane Roe changed her story a number of times.

a. In an interview with the Title IX investigator, she said that she got on the bed right away. Later, she changed her story to state that her back was hurting and John Doe helped with stretching exercises.

b. In an interview with the Title IX investigator, she said only that they were kissing at one point. Later she changed her story to admit that she touched John Doe's penis and fooled around consensually.

c. In an interview with the Title IX investigator, she said John Doe old me to take my pants off. Later she changed her story and said that she I took off her own pants.

d. In an interview with the Title IX investigator, she said she did not mention that she asked John Doe to put penis in breasts    Later, she changed her story to state, that she him to put his penis between my breasts"

e. In an interview with the Title IX investigator, she said she could not complete a full vaginal exam because she was in too much pain.    However, medical records did not indicate any injuries.

f. In an interview with the Title IX investigator, she said that the medical staff took pictures of her eyes because they showed evidence of choking    No pictures have ever been provided to John Doe.

47. On or about March 2, 2015, Jane Roe submitted a complaint to the UC Title IX administrator, Jyl Shaffer.

48. John Doe was not contacted about the Title IX complaint until about May 14, 2015.

49. John Doe voluntarily met with Shaffer a couple of weeks later.

a. John Doe appeared with his advisor.

b. John Doe believed that the interview was not for fact-finding but was more of an interrogation. For example, Shaffer repeated the same question a number of times

29

hoping to catch John Doe in a mistake. He and his advisor characterized it more as a "lie detector test."

50. John Doe was permitted to view a draft of the report and to clarify some witness statements

51. John Doe was biased by the undue delay in this investigation.

    a. While the Title IX Office was aware of this matter in February 2015, Shaffer did not attempt to obtain any information from John Doe until approximately June 2015 (although Ms. Shaffer presented John Doe with a letter dated May 14, 2015, John Doe did not receive an email with this letter as an attachment until May 20, 2015).

    b. John Doe, who has a busy schedule because of academic and athletic commitments, had offered repeatedly to make himself available on a number of occasions shortly after receiving notice.

    c. On information and belief, others, including the Athletic Director, complained about how long the process was taking to UC President Ono.

52. John Doe appeared for an ARC Hearing on August 26, 2015. John Doe appeared his with advisor. The advisor was not permitted to participate.

53. The ARC Hearing had a number of significant procedural problems:

    a. The ARC Hearing Panel was not instructed that John Doe was innocent until proven guilty or that the complainant bears the burden of proof by a preponderance of the evidence. This likely led to confusion by the panel, especially in a case like this where the panel was compelled to decide the case in large part based on the credibility of the witnesses.

    b. Jane Roe repeatedly failed to abide by the rules of the UC disciplinary process. This misconduct had an adverse affect on the hearing panel and constituted a substantial error. This misconduct also revealed possible bias on the behalf of the hearing panel;

Jane Roe was coached by the Chair of the hearing panel, and even given the opportunity to "write down" her statement if she preferred.

c. Jane Roe repeatedly attempted to interject unsolicited information. For example, after John Doe was finished telling the panel a part of his story, Jane Roe attempted to intervene. This had the effect of disrupting John Doe thought process and undermining the effectiveness of his presentation. This occurred on at least two occasions after she was warned to not interrupt. At other times, Jane Roe made audible gasps or other noises while John Doe was attempting to speak, and otherwise acted in an inappropriate manner.

d. During her closing arguments. Instead of addressing her remarks to the hearing panel, the complainant addressed and confronted John Doe directly and aggressively. This conduct could have led the panel to decide this matter based on emotion rather than reason.

e. The ARC hearing procedure permitted the Hearing Panel to hear the "impact statement" from Jane Roe about the effect of the alleged violation on the complainants prior to making a determination that a violation of the Code of Student Conduct occurred. This evidence was irrelevant to the determination of responsibility. Moreover, it was unduly prejudicial and likely had the effect of allowing the panel to make a decision based on emotions and claimed injury rather than the facts of the matter.

f. The ARC Hearing Panel viewed evidence that had not been disclosed to John Doe prior to the hearing, as required by the Code of Student Conduct. The Rules require that the parties "submit any . . . evidence at least ten (10) calendar days prior to the hearing." The hearing panel received a color photograph of alleged bruises suffered by the Complainant. Prior to the hearing, only a black-and-white photocopy of the photograph

31

was provided.  This is significant, as John Doe would have possibly been able to have the color photograph reviewed by someone who could determine if this was more likely a bruise or a "hickey."

g.  The ARC Hearing Panel received a typed statement from Jane Roe.  This statement was not provided to John Doe prior to the hearing.  Disturbingly, the packet of information provided to John Doe during the hearing was disorganized and difficult for John Doe to review.

h.  John Doe was pressured to proceed and not object to the provision of new evidence immediately prior to the hearing. Cummins told John Doe that the hearing could be rescheduled, but then suggested that this would negatively impact the proceedings.  He said, "Nobody likes the idea of delaying the hearing."

i.  The UC Code of Student Conduct requires that a student be provided with the opportunity to "challenge participation of any committee member on the grounds of conflict of interest."  However, the names of the ARC Hearing Panel members were not provided to John Doe in advance of the hearing.

j.  Although the UC Code of Student Conduct does not appear to provide a specific amount of time that a student should receive to prepare for a hearing, adequate notice of the hearing time is necessary in order for the student to prepare and possibly obtain counsel.  Other rules, such as the rule for the disclosure of witnesses and evidence, suggest that at least ten days notice should be provided

k.  There was significant confusion about the hearing date. Cummins sent an email to John Doe on Monday, August 24, 2015 indicating that the hearing was set for "Wednesday, August 25, 2015."  This was confusing, because August 25 was a Tuesday.  The hearing ultimately proceeded on Wednesday.  Regardless of the confusion about notice, this

32

provided John Doe was less that 72 hours actual notice of the hearing, and his advisor did not receive confirmation until about 27 hours before the hearing.

l. The UC Code of Conduct provides that "The hearing chair will provide a list of the witnesses and any other submitted evidence to the parties generally 5 calendar days prior to the hearing." This did not occur. No witness list or list of submitted evidence was ever provided to John Doe. As a result, John Doe was unable to adequately prepare to address the evidence and testimony presented at the hearing.

m. The UC Code of Conduct provides that "Witnesses shall be present only when giving testimony." However, John Doe believes that one of Jane Roe's witnesses was permitted to remain in the hearing room while John Doe responded to questions from the Panel.

54. John Doe was found responsible by the ARC Hearing Panel and recommended a one year suspension.

55. John Doe submitted an appeal, pursuant to UC policy, on September 3, 2015.

56. John Doe is subject to an "interim" suspension while the appeal is considered. This interim suspension prevents him from attending class, participating in football, or otherwise being on campus.

**GENDER DISCRIMINATION**

57. UC's actions against John Doe was motivated, in part, by the gender of Doe II.

    a.  Partly our of concern for the Department of Education enforcement, UC imposed discipline on John Doe in circumstances when discipline would not be imposed on female students.

    b.  UC reached an erroneous outcome on the basis of sex when it decided to impose discipline on John Doe. This decision was flawed due to John Doe's gender. UC was reacting against him, as a male, to demonstrate to the Department of Education that Defendants would take action against males accused of sexual harassment.

58. ARC Hearing Panels often permit complainants to make derogatory remarks about the accused student and to rely upon statistical evidence about the incidence of sexual assaults on college campuses. ARC Hearing Panels also permit complainants to provide a "impact statement" about the effects of the alleged misconduct before making any determination of whether a rule was violated.

59. In one case, an ARC Hearing Panel found a student responsible even after the female complainant refused to answer any questions. In that case, the complainant was upset that a new ARC Hearing was ordered by the appeal process. The student made a statement and then stormed out before she could answer any questions. The ARC Hearing Panel still found the male student responsible.

60. In other cases, High-ranking UC officials attempted to interfere with the criminal investigation. For example, in one case:

    a.  A March 25, 2014 email from the University of Cincinnati Police Chief to another UC official about a separate case expressed these concerns. In response to a request by the

34

UC General Counsel, Kenya Faulkner, to view an investigative file, Chief Corcoran

wrote:

> I still have concerns about this, both for the fact that it distracts the detectives from doing the investigation in order to put this together, as well as the fact that Kenya mentioned she may needed it in order to discuss with Ryan what is going on with the investigation. I maybe overly worried here, but *I think it is very important that we are allowed to conduct a thorough and complete investigation without any appearance of influence.*

b. Faulkner apparently contacted the detectives and attempted to steer the investigation in certain directions. During a deposition, one of the detectives testified that the other detective "was upset with the fact that the flow of the investigation was being obstructed." He later said that the detective was upset that the UC General Counsel "was trying to impede our train of thought and our investigation . . ."

c. Faulkner contacted the Hamilton County Prosecutor's Office to discuss the investigation of this matter.

61. Complainants receive various accommodations from UC, including, the rescheduling of assignments and consideration in exam schedules simply because they have claimed to be victims of sexual assault. These accommodations constitute benefits offered to complainants that are not available to other students.

a. The presence of these accommodations could adversely impact the credibility of complainants. II. For example, if a student later retracts her story, she could face adverse impact on her grades if the schoolwork related accommodations were deemed to have been improperly obtained.

b. The ARC Hearing Panels are not provided with this information in order to draw its own conclusions about the credibility of complainants.

62. Cummins' job requires him to advocate on behalf of the alleged victim to obtain accommodations from the University while at the same time conducting his investigation. The

Department of Education has warned that having the Title IX coordinator wear different hats can create an impermissible conflict of interest. Dear Colleague Letter at 7 ("The Title IX Coordinators should not have other job responsibilities that may create a conflict of interest.").

63. UC has attempted to obtain statements from accused students while criminal investigations are was ongoing, despite the fact that the students have a constitutional right to remain silent.

64. UC investigators have hidden or failed to include in investigative reports information that is favorable to accused students. In one case, during the course of his investigation Cummins had been provided with a statement from a witness who corroborated and supported the accused student's version of events. Cummins did not mention in his report that he had received this statement from the Ohio University student. The report was later provided to the ARC Panel.

65. UC has a pattern of decision-making that has ultimately resulted in the imposition of discipline on John Doe.

    a. Since 2010, UC has produced records indicating that it conducted thirty-three (33) investigations into allegations that students or staff members have engaged in sexual misconduct. These investigations concern 28 separate incidents (different individuals are alleged to have violated the Sexual Misconduct Policy in some incidents). These investigations range from serious, such as rape allegations, to "less serious," such as disputes over property.

    b. The results and targets of these investigations indicate that the hearing process and discipline imposed on members of the UC community are flawed because of gender bias.

    c. In the 2014-2015 school year, UC had an enrollment of 43,691. *See* https://www.uc.edu/about/ucfactsheet.html . Of the entire student population, 19,975, or approximately 46%, were male.

d.  The gender of the complainant, or alleged victim, could be identified in 28 matters. In only three of the 28 cases, or approximately 11%, of the cases was the complainant male. Notable, in all three of these cases, the respondent was also male.

e.  The gender of the respondent, or student accused of misconduct, could be identified for 29 matters. In 28 of the 29 matters, or approximately 97%, the respondent was male. In the one case involving a female respondent, there appeared to be multiple complainants.

66. Comparing cases that more closely match the fact pattern of the John Doe matters, according to the public records provided by UC, Since 2011, UC has investigated nine charges of sexual assaults involving students (including the John Doe matters).

a.  In every one of these cases, or 100%, the respondent was male. And, in every case where the sex of the complainant could be determined (8 of the 9 matters), the complainant was female.

b.  In every one of these cases, or 100%, the respondent was found to be responsible.

   i.  UC has never had a situation where an allegation of sexual contact without consent was made by a female student against a male student and the male student was subsequently exonerated.

   ii.  In other words, if a male student is alleged to have engaged in sexual conduct with a female student without consent, the data suggests that a finding of responsibility and the imposition of discipline ranging from suspension to dismissal is inevitable.

c.  In five or six matters (two appear to be based on the same underlying facts), aside from the John Doe case, UC investigated matters where one or more of the students was unable to consent to sexual activity because a student was impaired due to alcohol.

          i. In all six of these cases, the complainant was female and the respondent was male.

          ii. In all six cases, the male respondent was ultimately found to be responsible.

    d. UC has engaged in selective enforcement when it comes to cases where one or both parties are intoxicated.

          i. Although the facts of these cases are not easy to discern, it appears that in some of the matters all parties were drinking, yet UC identified the male participant in drunken sexual encounters as the initiator, notwithstanding the comparable intoxication of both participants.

          ii. For example, in a 2010 matter, the male respondent told Cummins "There is no question in my mind that things would not be so confusing now *if we had both been sober than*. The fact that she and I had been drinking that night sits near the top of my list of regrets." Yet despite receiving information that both the male and female student were intoxicated, UC only investigated and impose discipline on the male student.

67. The view of males incorporated into UC's practices and procedures relies on a chauvinistic view of men as "predators" and women as the "guardians" of virtue. Based on a review of all investigations, the UC practices and procedures appear to not necessarily be hostile to men, but can be seen as biased in favor of unfairly protecting "vulnerable" and "virtuous" females.

    a. UC has never imposed discipline on a female student in a case involving only a male complainant.

    b. UC has ignored the likely presence of situations on campus where men are the victims and, instead, has focused in efforts on protecting females. Based on campus crime surveys, UC should have investigated a significant number of cases involving male

victims of sexual assault, perhaps as many as the number of cases involving female victims.

    i. "Federal surveys detect a high prevalence of sexual victimization among men— in many circumstances similar to the prevalence found among women." Lara Stemple and Ilan H. Meyer, *The Sexual Victimization of Men in America: New Data See Challenge Old Assumptions*, Am. J. of Pub. Hlth: June 2014, 104:6 pp. e19-e26.

    ii. A survey by Bureau of Justice Statistics, National Crime Victimization Survey, 1995–2013, suggests that the rate of rape and sexual assault victimization was lower for males ages 18 to 24 than for females. This study suggested that college-age male victims accounted for 17% of rape and sexual assault victimizations against students. *See National Crime Victimization Survey*, 1995–2013, *cited in* Sofi Sinozich and Lynn Langton*, Rape and Sexual Assault Victimization Among College-Age Females, 1995–2013* (Dec. 2014).

    iii. Regardless of which figure is accepted, the number of investigations by OU where there is a male victim of an alleged sexual assault is far below what would be expected.

68. The gender bias by UC is illustrated by a 2014 investigation of harassment.

    a. In this matter, a male student was investigated for an alleged violation of the Sexual Misconduct Policy after he threatened to punch a Female staff member in the uterus.

    b. The 2014 incident began when the female staff member was walking through a male bathroom. The male student was upset at this invasion of his privacy and made the inappropriate threat. The male student was found "responsible" and placed on probation.

    c.   The bias in the UC system is seen by the fact that the male student was subject to an investigation and discipline, while the female staff member who entered the male bathroom was not subject to any investigation or discipline.

         i.   Notably, Defendant Cummins was aware of this gender bias but failed to take any corrective action. He wrote an email about this incident. In this email, he stated he was "concerned about the decision of the opposite sex walking through the bathroom just for a shortcut (pass through). If this was a male walking through a female, it would generate a big buzz."

69. This 2014 matter stands in stark gender-based contrast to a 2012 matter where a male student was disciplined for inappropriate conduct (peeping) in the male bathroom.

**IRREPARABLE HARM**

70. John Doe has almost completed his education at UC He was to graduate in December 2015.

71. John Doe faces a substantial hardship if he continues to not play in football games.

    a.   This is his senior season and his last opportunity to compete.

    b.   John Doe wishes to pursue an NFL career. He will be unable to do so if he isn't able to have "game film" from his senior season.

72. The failure to comply with the 60-days guideline from the Department of Education threatens to cause irreparable harm to John Doe and was an action in bad faith by UC.

    a.   Jane Roe reported the allegation on March 2, 2015  According to Department of Education guidance and OSU policies, in the Dear Colleague Letter, the matter should have been completely resolved, including any hearings and appeals, on or before May 2, 2015.

    b.   The hearing in this matter did not take place until August 26, 2015.

    c.   The appeal is still pending.

73. UC has acted in bad faith in delaying this matter.

    a.  UC is aware of the harm being suffered by John Doe. He was informed of the decision on August 26, 2015 and that UC intended to expel him. UC also informed John Doe that he would be placed on an "interim suspension" which prohibited him from attending classes or participating in football activities. He submitted an appeal on September 3, 2015 and a separate letter to Defendant Merchant asking that the appeal be stayed while UC considered the appeal.

    b.  Defendant Merchant did not schedule a hearing on whether to stay the interim suspension pending the appeal until September 10, 2015. At this hearing, Merchant prohibited John Doe from presenting evidence or having any witnesses testify on his behalf. Merchant claimed that this was not permitted by the UC procedures, but did not produce any documents setting forth such procedures. Merchant also refused to record the hearing and provide the John Doe copies of all materials she had reviewed in preparation for the hearing.

    c.  Merchant told John Doe that he would receive a decision by Monday, September 14, 2015. At the end of the day on September 15, 2015, Merchant decided that John Doe should remain suspended from UC.

74. The interim suspension is denying John Doe the opportunity to complete his education at his chosen institution.

75. Even if John Doe wished to continue his education at another school, he would lose his scholarship.

## COUNT I
## (DECLARATORY JUDGMENT – VIOLATION OF DUE PROCESS PROVISIONS OF UNITED STATES AND OHIO CONSTITUTIONS)

76. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

41

77. This Count is brought against all defendants.

78. The Fifth Amendment to the United States Constitution, made applicable to the State of Ohio by the Fourteenth Amendment, provides that no person shall "be deprived of life, liberty, or property, without due process of law."

79. The Fourteenth Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law."

80. Section 16, Article I, Ohio Constitution, guarantees that every person injured in his lands, goods, person or reputation shall have remedy by "due course of law."

81. The Due Process Clauses of the Ohio and United States Constitutions are implicated by higher education disciplinary decisions, including the disciplinary decisions under the UC Code of Student Conduct.

82. UC has a constitutional obligation to provide a fundamentally fair and reliable hearing process.

83. UC has an additional obligation under the Ohio Administrative Code to provide a hearing process that is consistent with the customs of a free society, which includes recognition of the basic due process rights of students.

84. The Plaintiff is entitled under the Constitutions of Ohio and the United States, as well as under the Ohio Administrative Code, to the opportunity to be heard in a meaningful manner at the ARC Hearing.

85. The Plaintiff's interests in the results of the ARC Hearing are significant.

    a. Dismissal or suspension from UC would deny the Plaintiff the benefits of education at their chosen school.

    b. Dismissal and other sanctions would also damage the Plaintiffs' academic and professional reputation.

    c.   Dismissal or other sanctions are likely to affect the Plaintiffs' ability to enroll at other institutions of higher education and to pursue a career.

86. The Defendants have violated the Plaintiffs' due process rights in the following manner:

    a.   UC conducted biased investigations, which were then provided to the ARC Hearing Panel.

    b.   UC permitted the use of hearsay evidence at the ARC Hearing without providing the Plaintiffs with the opportunity to effectively cross-examine witnesses.

    c.   The ARC Hearing Panel heard "impact statements" from the alleged victims before even determining that a violation of the UC Code of Student Conduct had occurred.

    d.   The ARC Hearing Panel did not apply the UC rules properly, including the definition of consent as set forth in the UC Title IX Policy and did not apply the appropriate definitions of key legal terms set forth in the UC Policy Statement or Revised Code Chapter 2907.

    e.   The Plaintiffs were not permitted to effectively cross-examine adverse witnesses. All questions had to be submitted through the ARC Hearing Panel Chair, and no follow-up was possible.

    f.   The Plaintiffs were denied the effective assistance of an attorney or other advisor. An advisor was permitted to be present, but the advisor was not permitted to participate.

    g.   The Plaintiffs were not presumed to be "innocent until proven guilty" Instead, UC determined that the party seeking to impose responsibility on a student does not have the burden of proof.

    h.   An ARC Hearing Panel has never failed to recommend that a student be found responsible and significant discipline be imposed.

87. The Plaintiff and the Defendants have a dispute about whether the UC Code of Conduct, as applied to John Doe I, violates the Due Process Clause of the United States Constitutions, the Due Course of Law Clause of the Ohio Constitution, and the requirement of the OAC that any hearing process be consistent with the customs of a free society.

88. The Plaintiff is entitled to a declaration that the UC Code of Conduct, as applied to John Doe, violates the Due Process Clause of the United States Constitutions, the Due Course of Law Clause of the Ohio Constitution, and the requirement of the OAC that any hearing process be consistent with the customs of a free society.

89. Pursuant to 42 U.S.C. §1988, John Doe is entitled to his attorney's fees incurred in bringing this action.

## COUNT II
### (42 U.S.C. §1983 -- VIOLATION OF DUE PROCESS PROVISIONS OF UNITED STATES CONSTITUTION)

90. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

91. This count is brought against Cummins and Merchant in their individual capacities for damages.

92. The Defendants have acted under color of law in violating the Plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States Constitutions.

93. The Defendants have acted intentionally and with callous disregard for the Plaintiffs' clearly established constitutional rights.

94. As a direct and proximate result of the Defendants' violations of the Plaintiff's constitutional rights, the Plaintiff has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

95. Pursuant to 42 U.S.C. §1983, Defendants Cummins and Merchant are liable to the Plaintiff for his damages.

96. Pursuant to 42 U.S.C. §1988, the Plaintiff is entitled to their attorney's fees incurred in bringing this action.

## COUNT III
## (DECLARATORY JUDGMENT -- TITLE IX)

97. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

98. This count is brought against UC.

99. Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq., and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Title IX provides in pertinent part: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

100. Defendant UC is an education programs or activities operated by recipients of Federal financial assistance.

101. Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline.

102. UC committed impermissible gender bias against the Plaintiffs in the investigation and adjudication of Jane Roe I's, Jane Roe II's, and Jane Roe III's accusations.

103. The decisions of the ARC Hearing Panels for John Doe were erroneous outcomes which was the direct result of a flawed and biased proceeding.

104. Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose discipline upon Doe II and Doe I. These circumstances include:

45

a. A general atmosphere at UC and the Office of University Judicial Affairs where those who lodge a complaint of sexual assault are immediately treated as "survivors."

b. Training of ARCH Hearing Panels from victims' advocates in an inappropriate manner.

c. The decision of UC to institute judicial proceedings prior to the completion of an investigation.

d. The failure of UC to conduct full and fair investigations, including his failure to include significant evidence that tended to exonerate accused students.

e. Improper pressure and interference from the UC General's Counsel's Office on UC police officers who conduct criminal the investigation.

f. The failure of the ARC Hearing Panels to follow its own rules and procedures.

g. The failure of the ARC Hearing Panel to afford accused students the opportunity to present evidence in their defense and to effectively cross-examine their accusers under the auspices of "protecting" victims.

h. The failure of UC to require the presence of key witnesses at the ARC Hearing.

i. The failure of UC to inform ARC hearing panels that accused students are innocent until proven guilty and to require that the party seeking to impose discipline bear the burden of proof.

j. The role of the Office for Institutional Equity as both an investigator and advocate for alleged victims.

105. UC has discriminated against John Doe because of sex. This discrimination is intentional and is a substantial or motivating factor for UC's actions in this case. This is demonstrated by the following facts:

a. UC, encouraged by federal officials, has instituted solutions to sexual violence against women that abrogate the civil rights of men and treat men differently than women.

46

b. UC has provided biased training to ARC Hearing Panel members, completed flawed investigations, denied John Doe of access to equal institutional support during the hearing process, applied flawed or incorrect legal standards, denied John Doe the support of counsel, denied John Doe the ability to effectively cross-examine adverse witnesses, and imposed the burden of proof upon the accused because John Doe was a male accused of sexual assault

c. UC officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct, in this case the imposition of discipline on John Doe is the a result of a flawed and biased hearing process. This resulted in a deprivation of access to educational opportunities at UC.

106. UC has a pattern of pattern and practice of discriminatory decision-making that tends to show the influence of gender on the investigative and discipline process. This is shown, in part, by the imposition of investigations and sanctions for sexual assault and sexual harassment under the Sexual Misconduct Policy predominantly against males.

107. UC applies "archaic assumptions" in reviewing allegations against male students.

108. The circumstances of the Investigatory process and the ARC Hearings cast doubt on the accuracy of the outcome of the disciplinary proceeding.

109. The Plaintiffs and UC have a dispute about whether the UC policies and practices for adjudicating allegations that students have committed sexual assault or sexual harassment in violation of the UC Code of Conduct violates Title IX.

110. The Plaintiff is entitled to a declaration that the UC policies and practices for adjudicating allegations that students have committed sexual assault or sexual harassment in violation of the UC Code of Conduct violates Title IX.

47

111.    Pursuant to 42 U.S.C. §1988, John Doe is entitled to his attorney's fees incurred in bringing this action.

## COUNT IV
### (TITLE IX)

112.    Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

113.    This count is brought against UC.

114.    As a direct and proximate result of the UC's violations of the Plaintiffs' rights under Title IX, the Plaintiffs have suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

115.    UC is liable to the Plaintiff for his damages.

116.    Pursuant to 42 U.S.C. §1988, John Doe is entitled to his attorney's fees incurred in bringing this action.

## COUNT V
### (INJUNCTIVE RELIEF)

117.    Plaintiffs repeat and incorporate all the allegations of this Complaint, as if fully set forth herein.

118.    This claim is brought against Cummins and Merchant in their official capacities for the injunctive relief sought for violations of constitutional rights, and against UC for injunctive relief sought for claims under Title IX.

48

119.    The Defendants continued actions under the UC Code of Student Conduct against the Plaintiffs violates the United States Constitution, the Ohio Constitution, and the Ohio Administrative Code.

120.    The Defendants continued actions under the UC Code of Student Conduct against the Plaintiffs violates Title IX.

121.    The Defendants continued actions against the Plaintiffs under the UC Code of Student Conduct is causing substantial, immediate, and continuing damage to the Plaintiffs.

122.    The Plaintiff is entitled to an Injunction from this Court prohibiting the imposition of, or reporting of, any disciplinary actions under the UC Code of Student Conduct against the Plaintiffs.

*Wherefore*, Plaintiff seeks the following relief from the Court:

- On Counts I and III, Judgment in favor of the Plaintiff declaring that the Defendants have violated the United States Constitution, the Ohio Constitution, the Ohio Administrative Code, and Title IX;
- On Counts II and IV, damages in an amount to be determined at trial;
- On Count V, an Injunction prohibiting the imposition of, or reporting of, any disciplinary actions under the UC Code of Student Conduct against the Plaintiff.
- Court costs, other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as provided for by 42 U.S.C. § 1988 and otherwise.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

Respectfully submitted,


_____/s/ Joshua Adam Engel_____
Joshua Adam Engel (0075769)
ENGEL & MARTIN, LLC
5181 Natorp Blvd., Suite 210
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com



_____/s/ Michael K. Allen
Michael K. Allen (0025214)
MICHAEL K. ALLEN & ASSOCIATES
810 Sycamore Street
Cincinnati, OH 45202
(513) 321-5297
mike@mkallenlaw.com

## VERIFICATION

I, ███████████████ being duly sworn, state that I have reviewed the factual allegations contained in this Verified Complaint.  I am the John Doe described in the Complaint.  I believe that the disclosure of my identity will cause me irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34  CFR Part 99.  All of the factual allegations in the Verified Complaint are true and accurate to the best of my knowledge.

████████████████████████

████████████████████████

████████████████████████

Subscribed and sworn before me this _16th_ day of September 2015

_____
Notary Public

51

**Title:** Conduct, rights and responsibilities:  Student code of conduct. **Exhibit A**
**Division:** 40:  Students
**Number:** 40-5-05

(A)     Introduction

      (1)     Preamble

            (a)     The Student Code of Conduct ("SCOC")  is intended to provide broad guidance in identifying and discouraging behavior that conflicts with the building of a strong and just community that respects and protects the diverse interests and goals of all students, all student organizations, and the university of Cincinnati's mission "to provide the highest-quality learning environment, world-renowned scholarship, innovation and community service, and to serve as a place where freedom of intellectual interchange flourishes."

            (b)     The SCOC is administered consistently with the university's policy entitled "Conduct, rights and responsibilities:  Statement of student conduct, policies and procedures," rule 3361:40-5-03 of the Administrative Code.  Paragraph (A)(1)(b) of that rule states:  "In a university, the paramount value involved in student conduct should be self-governance with each student bearing the responsibility for his/her own behavior. Although it is thus assumed that students are mature and responsible individuals and that the university does not occupy a parental role, formal disciplinary sanctions nonetheless may be imposed whenever student conduct interferes with the university's duty to afford its members an opportunity to attain educational and other stated institutional objectives. In pursuance of the goals of the university, disciplinary policies, procedures, and standards should be primarily educational rather than punitive in nature and should be consistent with both the customs of a free society and the nature and function of an institution of higher learning."

            (c)     The authority for the SCOC is contained in rule 3361:40-5-04 of the Administrative Code and section 3345.21 of the Revised Code. The university may proceed through the disciplinary process as outlined in the SCOC, regardless of any action by other authorities including city or state police, or local, state, or federal courts.

            (d)     Ten representatives of the administration, faculty and students constituting a SCOC Review Committee provide a democratic mechanism for the review of student conduct standards, as required by rule 3361:40-5-03 of the Administrative Code.

            (e)     It is each student's responsibility to know and comply with the university's SCOC and other rules and policies of the University of

1

Cincinnati.  The provisions of the SCOC are not to be regarded as a contract between the university and the student.  The university reserves the right to change the SCOC at any time during the student's term of enrollment, but no ex post facto rule of misconduct will be applied.

(f)     It is the university's responsibility to make reasonable efforts to make the SCOC available for students.  Toward that end, the division of student affairs and services will regularly circulate the SCOC along with other rules, regulations, and policies, which directly affect students at the University of Cincinnati. The SCOC will be available for review in the following locations:  the office of the university ombuds, the university judicial affairs office, and the university web page.

(2)     Charter of student rights and responsibilities

(a)      Application of the SCOC shall be consistent with rule 3361:40-5-01 of the Administrative Code.  Paragraph (A) of that rule states:  "Students are members of society as well as members of the academic community. As members of society, students have the same responsibilities as other members of society and enjoy the same freedom of speech and peaceful assembly, and the right of petition that other members of society enjoy. As members of the academic community, they shall have the rights and be subject to the responsibilities which accrue to them by virtue of this membership. Institutional authority shall not be employed to inhibit such intellectual and personal development of students as is often promoted by the exercise of their rights and responsibilities both on and off the campus." The SCOC shall not be interpreted to impinge upon constitutionally protected rights and privileges, such as those under the First and Fifth Amendments of the United States Constitution. For example, the SCOC will not be interpreted in a manner that inhibits a student's right to freedom of speech and will not be used to compel students to make self-incriminating statements.

(b)     Paragraph (D) of rule 3361:40-5-01 states:  "Students shall be free from unreasonable searches and seizures by university personnel."

(c)     The first sentence of paragraph (E) of rule 3361:40-5-01 states:  "Students shall be responsible for maintaining established standards of scholarship and conduct essential to the educational mission and community life of the university."

(3) The SCOC is administered in accordance with applicable Federal and State laws as well as the university's policy on non-discrimination. In order to comply with federal civil rights laws including but not limited to Title IX of the Education Amendments of 1972, the SCOC has specific procedures for complaints of harassment and discrimination, which include complaints on the basis of race, color, religion, national origin, ancestry, disability, medical condition, genetic information, marital status, sex, age, sexual orientation, veteran status, or gender identity and expression. These

2

procedures also apply to sex or gender based violence, dating violence, domestic violence and stalking which are covered under Title IX.

(4)    Jurisdiction

The University of Cincinnati reserves the right to take reasonable action to engage conduct that undermines, interferes with, or obstructs the safety and security of the University community or that adversely affects the integrity or interests of the educational mission or functions of the University.

(a)    Students/Student Organizations

(i)    Undergraduate and graduate students who violate the SCOC shall be subject to appropriate disciplinary sanctions. Law and Medical students are only subject to their respective Honor Codes for conduct covered under such codes. Conduct not covered under such codes shall be subject to the SCOC. All other colleges with licensure or professional codes governing conduct shall adhere to the procedural requirements of this SCOC.

(ii)    Student organizations that violate the SCOC shall be subject to appropriate disciplinary sanctions. "Student Organization" refers to any number of persons who have complied with the formal requirements set forth to be registered and recognized as such or who are actively seeking registration/recognition.

(iii)    By admission to or attendance at the university, a student accepts the responsibility to comply with the SCOC and the rules and policies of the University of Cincinnati. The term "student" as used in the SCOC means an individual who has been accepted for admission to the university, registered for classes, enrolled at the university, or otherwise entered into any other relationship with the university to take or audit instruction and is pursuing undergraduate, graduate, or professional studies either on a full- or part-time basis. Student status lasts until an individual graduates, withdraws from the university, is dismissed, or is not in attendance for two complete semesters.

(b)    On and off campus behavior

(i)    The SCOC applies to student conduct that occurs on campus or on university owned, leased, or controlled premises. University campuses include University of Cincinnati Uptown Campus, UC Blue Ash, Clermont College and UC East – UC Clermont college.

(ii)    The SCOC applies to off-campus conduct under the following circumstances:

3

        *(a)* When the student is on academic assignment, attending a university event or an event of a registered student group, or acting as a representative of the university at an off-campus event; or,

        *(b)* When the university is notified by an arresting or prosecuting authority of misconduct within 2600 feet of any university campus resulting in a police report being filed, an arrest being made, summons being issued, or an indictment being returned against the student including but not limited to: a crime of violence as defined by paragraph (A)(9) of section 2901.01 of the Revised Code; for corrupting another with drugs as defined by section 2925.02 of the Revised Code; for trafficking in drugs or aggravated trafficking in drugs as defined by section 2925.03 of the Revised Code; for Underage Persons Offenses Concerning as defined by section 4301.69 of the Revised Code; for Opened Container of Beer or Intoxicating Liquor Prohibited At Certain Premises as defined by section 4301.62 of the Revised Code; for Purchase of Beer of Intoxicating Liquor by Persons under Twenty-One as defined by section 4301.63 of the Revised Code; for Prohibition Against Consumption of Beer or Intoxicating Liquor In Motor Vehicle as defined by section 4301.64 of the Revised Code; for Disorderly Conduct as defined by section 2917.11 of the Revised Code; for Resisting Arrest as defined by section 2921.33 of the Revised Code; for Possession of Controlled Substances as defined by section 2925.11 of the Revised Code; or, for violating substantially equivalent laws of other jurisdictions.

    (iii) The university also reserves the right to take disciplinary action for conduct when the student, or student organization, in the university's sole judgment, poses an obvious threat of serious harm to any member of the university community or when such conduct has continuing effects that create a hostile environment in a university program or activity.

(c)    Riotous behavior

    (i) Section 3333.38 of the Revised Code focuses on the riotous behavior of students on and around university campuses. The law has two separate penalty provisions—denial of financial aid and expulsion.

    (ii) Regarding financial aid, paragraph (B) of section 3333.38 of the Revised Code generally provides that an individual who is convicted of, pleads guilty to, or is adjudicated a delinquent child for committing aggravated riot, riot, failure to disperse, or misconduct at an emergency, shall be ineligible to receive any

student financial assistance supported by state funds for two calendar years from the time the individual applies for financial assistance.

(iii) Regarding expulsion, paragraph (C) of section 3333.38 of the Revised Code generally provides that a student who is convicted of, pleads guilty to, or is adjudicated a delinquent child for committing aggravated riot or riot, shall immediately be dismissed from the university. Moreover, no Ohio public university or college shall admit an individual who has been convicted of either aggravated riot or riot for one academic year after the individual applies for admission.

(iv) Action taken as a result of section 3333.38 of the Revised Code does not limit or affect the University of Cincinnati's ability to otherwise discipline students under the SCOC.

(d) Division of student affairs and services

(i) If it is not self-evident whether an alleged violation constitutes academic or nonacademic misconduct, the dean of the student's home college or designee and the dean of students or designee shall confer to determine whether the matter shall be handled as academic or nonacademic misconduct, and shall notify the appropriate administrator and all parties.

(ii) Without unnecessary delay from the date of discovery of the alleged offense, all nonacademic misconduct shall be reported to the office of university judicial affairs ("OUJA") and all instances of academic misconduct shall be reported to the college conduct administrator as well as to the OUJA. Reports or inquiries can be made to the Director of Judicial Affairs or designee, University of Cincinnati, Steger 745, 2801 UC Main Street Cincinnati OH 45221-0193. (Phone) 513-556-6814. Complaints can also be filed using the online reporting form.

(iii) At the start of each academic year, the vice president for student affairs and services will appoint a university appeals administrator ("UAA").

(iv) When a student organization is alleged to have violated the SCOC, the organization, as well as individual members, may be referred for action under the SCOC.

(v) Matters involving conduct that is covered by Title IX must be referred to the Title IX Coordinator or designee.

5

    (e)    Academic divisions: baccalaureate & graduate education and health affairs

        (i)    Each college dean shall appoint a college conduct administrator ("CCA") who shall be responsible for the administration of undergraduate academic misconduct procedures. The head of each graduate program or CCA will oversee the administration of academic misconduct procedures for graduate students in that graduate program.  Undergraduate program directors may have departmental responsibility for advising instructors and students with misconduct issues.

        (ii)    Any case involving academic misconduct shall originate with the instructor in whose course the alleged misconduct occurred.  The instructor will report sanctions for academic misconduct to the CCA who will report that misconduct to the CCA of the student's home college and to the OUJA.  College Hearing Panels (each a "CHP") make disciplinary recommendations to the college dean, except in cases of dismissal from the university which must be approved by the appropriate provost.

(5) Procedural overview

    (a)    Timeliness

        (i)    Listed timelines exclude weekends, holidays, and term breaks when the university is not in session, with the exception of harassment or discrimination matters.

        (ii)    In complaints involving conduct covered under Title IX, the university will generally conclude its investigation and adjudication within 60 calendar days.

        (iii)    Title IX investigation timelines can be found in the Title IX Grievance Procedure for Students and Third Parties. (http://www.uc.edu/titleix/policies-procedures.html)

            a.    The Title IX Coordinator or designee will generally provide an investigation report to OUJA within 25 calendar days of receipt of a formal complaint.

            b.    OUJA generally within five calendar days of receipt of disciplinary complaint, will send written notice to any student or student organization identified as allegedly being in violation of university rules related to Title IX.

            c.    OUJA must request, and the Dean of Students or designee and the Title IX Coordinator or designee must within three days of such request either deny or approve, any extension of time that

will delay notice to the student beyond fifteen calendar days. A copy of the request for an extension, and the final decision as to that request, shall be included in the student's disciplinary file.

    d.  A hearing will generally be completed within 24 calendar days from receipt of a disciplinary complaint.

    e.  Notice of the outcome and the right to appeal will generally be provided to all parties within 6 calendar days of the completion of a hearing.

(iv)    In discrimination or harassment cases not covered by Title IX, the university will generally conclude its investigation and adjudication within 60 calendar days. The OUJA will generally complete the investigatory report within 25 calendar days of receipt of the formal complaint.

    a.  OUJA generally within five calendar days of receipt of disciplinary complaint, will send written notice to any student or student organization identified as allegedly being in violation of university rules related to harassment or discrimination.

    b.  OUJA must request, and the Dean of Students or designee must within three days of such request either deny or approve, any extension of time that will delay notice to the student beyond fifteen calendar days. A copy of the request for an extension, and the final decision as to that request, shall be included in the student's disciplinary file.

    c.  A hearing will generally be completed within 24 calendar days from receipt of a disciplinary complaint.

    d.  Notice of the outcome and the right to appeal will generally be provided to all parties within 6 calendar days of the completion of a hearing.

(b)    Notification

All written notices to students shall be considered received upon delivery to a student's current local or permanent address on record with the university, by United States or campus mail, by bearcat on-line electronic messaging with delivery notification, or to the student in person. Such notice shall be deemed adequate unless the student shows just cause why the receipt of notice substantially impaired his or her ability to prepare for any review or hearing. It is the responsibility of the student to have his or her current local address on record with the university.

(c)    Standard of proof

The standard of proof used to determine whether a student has violated the SCOC shall be based on a preponderance of evidence.

7

(d)     Diminished capacity

Being under the influence of drugs or alcohol will not diminish or excuse a violation of the SCOC.

(e)     Sanctions for violations

A student found to have violated the SCOC will be subject to sanctions ranging from university disciplinary academic action to university disciplinary dismissal. More than one sanction may be imposed for a single violation. A single act may constitute a violation of more than one regulation.

(f)     Disciplinary records file

All disciplinary records and files, including those resulting in a finding of "responsible," are maintained in the OUJA for a period of seven years from the date of resolution. Records relating to a disciplinary action for academic misconduct are maintained by the director of the OUJA and CCAs as educational records separate from a student's academic record and are subject to the protections and release provisions by the Family Educational Rights and Privacy Act (FERPA) of 1974 as it may be amended from time to time.

(g)     Home college

The home college is the college in which the student is matriculated at the time of the alleged misconduct.

(h)     Withdrawal

If a student withdraws from the university before a disciplinary process has been completed, the process may proceed in the absence of the student and a block may be placed on the student's future registration requiring that the disciplinary action would have to be completed before the student would be allowed to register again.

(i)     Refund

In the event of a suspension or dismissal from the residence halls or university, the regular refund schedule outlined in university publications will apply.

(j)     Policy on Amnesty

(i)     The University community encourages the reporting of conduct code violations and crimes by victims, especially sexual misconduct. Sometimes, victims are hesitant to report such

8

conduct to university officials because they fear that they themselves may be accused of policy violations, such as underage drinking at the time of the incident. It is in the best interests of this community that as many victims as possible choose to report code violations to university officials. To encourage reporting, the University of Cincinnati has the discretion to not charge alleged victims, bystanders or witnesses, or others who participate in the SCOC process with non-violent violations, such as personal use of alcoholic beverages or drugs or narcotics, related to the incident.

(ii)     Amnesty will be determined on a case by case basis at the discretion of the Dean of Students or designee, except that in Title IX matters, the Dean of Students will obtain input from the Title IX Coordinator.

(iii)    The university may impose educational responses rather than sanctions.

(B)    Academic misconduct

(1)     Academic integrity and honor pledge

(a)     In pursuit of its teaching, learning and research goals, the university of Cincinnati aspires for its students, faculty and administrators to attain the highest ethical standards defined by the center for academic integrity as "a commitment, even in the face of adversity, to five fundamental values: honesty, trust, fairness, respect, and responsibility." (www.academicintegrity.org/). Although not all students are subject to a college honor code or pledge, every student is bound by the academic misconduct provisions of this code which are enforced, in part, to assure academic integrity. When dishonest students cheat to gain unfair competitive advantage over other students, they cheat themselves out of a decent education.

(b)     Some faculty members and academic units may require students before taking tests or when submitting assignments to sign a pledge. The pledge may contain language such as: "On my honor I pledge that this work of mine does not violate the University of Cincinnati Student Code of Conduct provisions on cheating and plagiarism." Honor pledges serve primarily as a teaching tool; unless a college has a mandatory honor code, pledges are used at the discretion of the instructor without imposition of a disciplinary sanction for students who honestly do passing work but object to a signed affirmation. Alternative pledges as well as information about the Academic Integrity Campaign can be obtained from the OUJA and online at http://www.uc.edu/conduct.

(2)     Academic misconduct definitions

(a)     Aiding and abetting academic misconduct

9

Knowingly helping, procuring or encouraging another person to engage in academic misconduct.

(b)     Cheating

Any dishonesty or deception in fulfilling an academic requirement such as:

(i)     Use or possession of unauthorized material or technological devices during an examination, an "examination" meaning any written or oral work submitted for evaluation or grade.

(ii)    Obtaining assistance with or answers to examination questions from another person with or without that person's knowledge.

(iii)   Furnishing assistance with or answers to examination questions to another person.

(iv)    Possessing, using, distributing or selling unauthorized copies of an examination or computer program.

(v)     Representing as one's own an examination taken by another person.

(vi)    Taking an examination in place of another person.

(vii)   Obtaining unauthorized access to the computer files of another person or agency or altering or destroying those files.

(c)     Fabrication

The falsification of any information, research statistics, lab data, or citation in an academic exercise.

(d)     Plagiarism

(i)     Submitting another's published or unpublished work in whole, in part or in paraphrase, as one's own without fully and properly crediting the author with footnotes, quotation marks, citations, or bibliographic references.

(ii)    Submitting as one's own original work, material obtained from an individual, agency, or the internet without reference to the person, agency or webpage as the source of the material.

(iii)   Submitting as one's own original work material that has been produced through unacknowledged collaboration with others without release in writing from collaborators

(iv)    Submitting one's own previously written or oral work without modification and instructor permission.

(e)    Violating Ethical or Professional Standards

Violations of any ethical or professional standards as outlined by the academic college

(3)    Procedures for academic misconduct

Students suspected of academic misconduct, whether acknowledging involvement or not, shall be allowed to continue in the course without prejudice pending completion of the disciplinary process.

(a)    Faculty-student resolution

(i)    Allegation

(a)    The original jurisdiction of any case involving academic misconduct shall be with the instructor in whose course the alleged misconduct occurred and in the absence of the instructor with the Department Chair of the course. An instructor who suspects a student of academic misconduct or receives a complaint alleging misconduct that raises suspicion may consult the CCA to learn whether there is any record of prior academic misconduct. The instructor will inform the student verbally or in writing within ten days of discovering the misconduct and give the student five days to respond. If needed, the instructor may arrange a review meeting with the student, and the student may have an adviser at that meeting.

(b)    If the student fails to respond within five days of notification, the instructor may impose a final academic sanction with a formal notice of action to the CCA and to the student. If the instructor takes no action within five days, the allegations shall be considered dismissed.

(ii)    Notice

(a)    Within five days of the student's response or a meeting the instructor will notify the student in writing of the sanctions and the college hearing options. Failure on the assignment sanction may be reported to the CCA at the discretion of the instructor and may not be disputed if the student admits responsibility. Failure for the course or greater sanction must be reported to the CCA.

(b) If the student fails to respond to the sanction notice within five days after responding or meeting with the instructor, the academic sanction is final.

(iii) Response to notice

(a) No later than five days from the time of the notice, the accused student shall notify the instructor in writing whether the student:

(i.) Accepts responsibility to the violations and agrees to accept the sanctions;

(ii.) Accepts responsibility but challenges a sanction; or

(iii.) Denies responsibility and requests resolution by the College Hearing Panel (CHP).

(b) If the student denies responsibility or challenges the sanction, the instructor will ask the CCA of the college in which the misconduct occurred to convene a CHP.

(c) If the student accepts responsibility and the sanction the instructor will notify the CCA of the college in which the misconduct occurred of how the matter was resolved and the action taken. The CCA will record that resolution and provide a copy to the director of the OUJA and to the CCA of the student's home college.

(b) College hearing panel resolution

(i) College hearing panel members

(a) When a faculty-student resolution is not possible, the CCA, without unnecessary delay, shall convene a CHP of the college in which the alleged misconduct occurred. The charge to this CHP shall be to investigate the alleged misconduct and to recommend appropriate sanctions.

(b) The CHP shall consist of: the hearing chair, one representative selected by the college faculty and one representative selected either by the college tribunal or student government for undergraduates, or by the graduate college tribunals or graduate student governance association for graduate students. The hearing chair shall be the CCA or designee. The hearing chair shall vote only in the event of a tie.

(c) Either the student charged or the instructor alleging

12

misconduct may challenge participation of any panel member on the grounds of conflict of interest. Challenges must be submitted in writing to the hearing chair within three days after the parties have been notified of the panel composition. The challenge must specify reasons that would prevent the individual from being unbiased with respect to the hearing proceedings. The hearing chair shall decide whether the challenge has merit. If the challenge is granted, a substitute will be appointed and the same option to challenge shall exist. If the hearing chair is challenged, the dean of the college or his or her designee shall determine the validity of the challenge and either replace or retain the hearing chair.

(ii) Hearing participants

(a) Presence at hearings shall be restricted to those individuals involved except as otherwise noted.

(b) The student may elect to have an adviser present who may consult with the student verbally or in writing in a quiet, non-disruptive manner, but the advisor may not actively participate as a spokesperson or vocal advocate in the hearing. Students are required to notify the hearing chair 24 hours prior to the hearing if the adviser is an attorney. A student should select an advisor whose schedule allows attendance at the scheduled date and time for the CHP resolution because delays will not normally be allowed due to the scheduling conflicts of an advisor.

(c) The university ombuds may be present as an observer.

(d) Witnesses are strongly encouraged to be present for hearings. However, if they are unable to attend, notarized statements may be submitted.

(e) If the student, faculty or staff member chooses not to attend the hearing, his or her notarized written statements shall be reviewed at that time and evaluated based on the information available. No adviser may be present for any party who does not attend the hearing.

(iii) Hearing procedures

(a) The hearing chair and the CHP shall have the right to determine the acceptability of testimony and other evidence during the hearing and may place time limitations on testimony and on closing comments.

13

(b)     When more than one student is involved in an allegation of misconduct, any involved student may request a separate hearing.  Such requests shall be made to the hearing chair at least two days (48 hours) prior to the scheduled hearing.

(c)     CHP hearings but not deliberations shall be recorded by the university.  Any record of the hearing shall remain the property of the university.  Either party may have post-hearing access to the recorded hearing.  However, to maintain confidentiality, students are not permitted an audio copy of the recorded hearing.

(d)     The CHP may alter or recommend to the dean sanctions of a disciplinary reprimand, probation, suspension or dismissal.

(iv)     Post-hearing procedures

(a)     Within three days after the conclusion of the hearing, the hearing chair shall send the panel's recommendation to the college dean and to the student.   When students outside their home college are involved in an academic misconduct case, the hearing chair shall also forward a copy of the panel's recommendation to each student's home college dean or university dean within ten days after the hearing.

(b)     Within five days after receipt of the panel's recommendation, the dean of the college or his or her designee shall concur with, modify, or reject the panel's recommendation and shall notify all parties in writing. Notification to the student shall include information about the appeal process and the name and address of the university appeals administrator.  If the student does not file an appeal within five days, the decision of the dean shall be final.

(c)     Records relating to a disciplinary action are maintained by the director of the OUJA and the appropriate college office as educational records separate from a student's academic record and are subject to the protections and release provisions by the FERPA.

(4)     Disciplinary sanctions for academic misconduct

Sanctions shall be imposed according to the severity of the misconduct.  Multiple sanctions may be imposed should the behavior call for the imposition of a more severe penalty.  In all cases, the university reserves the right to require counseling or testing of students as deemed appropriate.  Definitions of disciplinary sanctions include the following:

14

(a)     Academic action

Includes altering a grade or assigning a failing grade for the assignment, examination, or course.

(b)     Disciplinary report reprimand

Notifies the student in writing that the misconduct and sanction will be recorded in a disciplinary file and if misconduct recurs may be taken into consideration in determining further sanctions.

(c)     Probation

Imposes specific restrictions or places extra requirements on the student for a specified period.  These may vary with each case and may include action not academically restrictive in nature, such as restriction from participation in college activities or other requirements.  Disciplinary action should be consistent with the philosophy of providing constructive learning experiences as a part of the probation.  A student may be required to meet periodically with designated persons.  Any further misconduct on the student's part during the period of probation may result in disciplinary suspension or dismissal.

(d)     College or university suspension

Prohibits the student from attending the college or university.  University suspension prohibits the student from being present on specified university owned, leased, or controlled property without permission of the sanctioning administrator or his or her designee for a specified period of time.  The sanctioning administrator shall determine the effective beginning and ending date of the suspension.  Students placed on university disciplinary suspension must comply with all suspension requirements.  A student seeking to attend the university after the conclusion of his or her suspension shall first request permission to re-enroll from the OUJA and then apply for readmission to his or her college.

(e)     College or university dismissal

Permanently prohibits the student from attending classes in that college or permanently prohibits the student from re-enrolling at the university.

(f)     Other Disciplinary Educational Sanctions

Sanction designed to develop the student's behavior.  This includes service to the college and restrictions on the right of access to the college or university.

(C)     Nonacademic misconduct

(1)    Report nonacademic misconduct

All instances of alleged nonacademic misconduct shall be reported to the director of the OUJA. Matters involving Title IX will be referred to the Title IX Coordinator or designee. Any student found to have engaged in prohibited conduct, as defined in this SCOC, while within the university's jurisdiction shall be subject to disciplinary action by the university.

(2) Nonacademic misconduct definitions

    (a)    Aiding and abetting misconduct

        Helping, procuring, or encouraging another person to engage in nonacademic misconduct.

    (b)    Alcoholic beverages, unauthorized use

        Possessing or consuming alcoholic beverages on campus in unlicensed facilities, except during events or in circumstances authorized by university officials; failing to comply with state law or university policy regarding use, transportation, or sale of alcoholic beverages.

    (c)    Destruction of property

        Damaging, destroying, defacing, or altering the property of the university or the property of another person or entity.

    (d)    Dishonesty and misrepresentation

        Furnishing false written or oral information including false identification to university officials, faculty, or staff; forgery, alteration, or misuse of university documents or records.

    (e)    Disruption or obstruction

        Disrupting, obstructing, or interfering with university functions, activities, or the pursuit of the university mission, including, teaching, research, administration, or disciplinary proceedings.

    (f)    Disturbing the peace

        Disturbing the peace of the university, including disorderly conduct, failure to comply with an order to disperse, fighting, or public intoxication.

    (g)    Drugs or narcotics

Manufacturing, distributing, buying, selling, offering for sale, or possessing any illegal drug or narcotic including: anabolic steroids, barbiturates, hallucinogens, amphetamines, cocaine, opium, heroin, or marijuana. Proper use of substances as prescribed to a student by a physician is exempt.

(h) Failure to comply or identify

Failure to comply with the directions of a university official or any law enforcement officer acting in the performance of their duties or posted or written rules; includes failure to evacuate during an emergency and failing to identify oneself to any of these persons when requested to do so.

(i) Failure to comply with sanctions

Failure to comply with sanctions imposed in accordance with the procedures described herein.

(j) False charges or statements

Making false charges or allegations including statements made at university judicial hearings.

(k) False report of emergency

Causing, making, or circulating a false report or warning of a fire, explosion, crime or other catastrophe or emergency; includes activating a false fire alarm.

(l) Harassment or Discrimination

Conduct that violates the University Policy on Non Discrimination, the University Policy on Discriminatory Harassment, the University Policy on Sexual Harassment, and the University Policy on Sex Offenses.

i. Discriminatory Harassment is conduct that has the purpose or foreseeable effect of unreasonably interfering with an identifiable individual's work or academic performance or of creating an intimidating, hostile or offensive work or learning environment and is based on the targeted individual's perceived or actual race, color, religion, national origin, ancestry, disability, medical condition, genetic information, marital status, sex, age, sexual orientation, veteran status, or gender identity and expression.

ii. Discrimination takes place when an individual receives negative or adverse treatment based on perceived or actual race, color, religion, national origin, ancestry, disability, medical condition, genetic information, marital status, sex, age, sexual orientation, veteran status, or gender identity and expression and the conduct denies or limits the individual's ability to obtain the benefits of university's programs or activities.

17

(m)     Hazing

Failure to comply with rule 3361:40-3-12 of the Administrative Code, or state law regarding hazing where hazing generally means any act which endangers the mental or physical health or safety of a student, for the purpose of initiation, admission into, affiliation with, or as a condition of continued membership in a group or organization.

(n)     Identification, misuse of

Unauthorized transferring, lending, using or altering a university identification card or any other record or instrument of identification.

(o)     Information technology, misuse of

Theft, misuse or illegal use of information technology such as computer hardware or software, electronic mail or information, podcasts, voice mail, telephone, fax, including:

(i)     Unauthorized entry into a file to use, read or change the contents, or for any other purpose.

(ii)    Unauthorized transfer or distribution of a file.

(iii)   Unauthorized use of another individual's identification and password.

(iv)    Use of information technology to interfere with the work of another student, faculty member, or university official or with normal operations of the university.

(v)     Use of information technology for unauthorized posting of copyrighted materials or obscenities.

(p)     Law, violation of

Violation of any federal, state, or local law where the effect is interference with university activities or an identifiable individual's university work or academic activities.

(q)     Physical abuse or harm

Acts which cause or could cause physical harm to any person are prohibited.  Actions that threaten or cause a person to believe that the

18

offender may cause physical harm are also prohibited.  Examples of prohibited behavior include assault, battery, stalking, telephone harassment, sex or gender-based violence, threats, intimidation, physical abuse of one's self or another, verbal abuse, dating  violence, domestic violence, and any other conduct which threatens the health or safety of any person.

(r)     Probation, violation of

Violating the SCOC while on university disciplinary probation or violating the specific terms of that probation.

(s)     Property or services, unauthorized use

Unauthorized use or possession of property or resources of the university or of any person or entity.

(t)     Public endangering

Actions endangering others, including:  dropping objects from buildings, activating a false fire alarm, or tampering with safety equipment.

(u)     Residence hall rules and regulations

Violating the terms and conditions of the university housing agreement or of published rules and regulations of the office of resident education and development, or the office of housing or its dining facilities.

(v)     Retaliation, intimidation

Threats or acts of retaliation or intimidation made to another person in response to the implementation of the SCOC or university rules and policies.

(w)     Safety equipment, misuse of

Unauthorized use or alteration of firefighting equipment, safety devices, fire alarms, fire extinguishers or other emergency safety equipment.

(x)     Smoking policy

Violating the university smoking regulations set forth in rule 3361:10-17-06 of the Administrative Code.  Paragraph (B)(1) of that rule states: "Effective January 1, 2006, smoking shall be prohibited inside buildings, athletic facilities, and vehicles owned, operated or leased by the university of Cincinnati. Smoking shall also be prohibited within twenty-five feet of all university building entrances, exits, air intakes and operable windows. Smoking shall not be permitted on any bridge, overpass or enclosed walkway." (www.uc.edu/trustees/rules).

19

(y)     Theft or receipt of stolen property

Theft of property or services of the university or of any person or entity. Unauthorized possession of property known to be stolen or that may be identified as property of the university or of any person or entity.

(z)     Trespass and unauthorized access

Unauthorized access into or onto any university building, room, structure or facility, or property of the university or any other entity.

(aa)    University keys, misuse of

Unauthorized use, distribution, duplication or possession of any keys issued for any university building, laboratory, facility, room, or vehicles.

(bb)    University policies or rules

Any violation of published university Rules or Policies.  University Rules can be found at: http://www.uc.edu/trustees/rules/.  University Policies can be found at http://www.uc.edu/about/policies/default.html.

(cc)    Weapons

Use, storage, or possession of a firearm, explosive device of any description, ammunition or anything used to threaten, harm, or disrupt the university community including but not limited to, firecrackers, compressed air or spring activated guns, pellet guns, BB guns, paintball guns, water guns, nerf guns and knives of any type or other items which are deemed threatening by the university.

(3)     Hearing procedures for nonacademic misconduct

(a)     Complaint and  notice

(i)     Complaint

Any person, department, organization or entity may file a complaint with the OUJA alleging a violation of the SCOC by a student or student organization.  In complaints involving harassment or discrimination, both the Complainant and the Respondent shall receive concurrent notice of the complaint.

The Title IX Coordinator or designee will conduct an investigation of Title IX matters--matters related to sex or gender based harassment or discrimination--prior to the initiation of the OUJA adjudication process.

In harassment or discrimination matters not involving Title IX the OUJA shall conduct an investigation prior to the initiation of the OUJA adjudication process.

(ii)    Notice

(a) After reviewing a complaint, the Director of the OUJA or designee initiates the disciplinary process by giving the student or student organization written notice of the alleged violations. The written notice shall describe the day, time, and location of the alleged violations and inform the student or student organization about the reported circumstances underlying the alleged violations.  The notice shall state the date, time, location of the procedural review, and the name of the review administrator.

(b) In complaints involving harassment or discrimination, both the Complainant and the Respondent will receive notice of the opportunity to meet with the OUJA designee.

(iii)   Procedural review

(a)     In complaints involving harassment or discrimination, the purpose of the procedural review is to allow both the Complainant and the Respondent the opportunity to review the alleged violation(s) and ask questions about the disciplinary process. Both the Complainant and the Respondent will receive concurrent notification of their right to a procedural review. Complaints involving harassment or discrimination are heard by an administrative review committee (ARC), regardless of whether the Complainant or Respondent appears at the procedural review. Only the ARC will determine whether a policy violation occurred. If the Respondent chooses to accept responsibility, they may do so either in person to the ARC or via a written statement which will be submitted to the ARC. In complaints involving harassment or discrimination where multiple students or student organizations are charged, students or student organizations charged in the same incident will have separate ARC hearings. In Title IX cases the Title IX Coordinator or designee may recommend to the Director of OUJA that the cases be separated or heard together.

(b)     The purpose of the procedural review in matters not involving harassment or discrimination is to review the alleged violations, provide an explanation of the disciplinary process, discuss the student's or student organization's options for resolution, receive the range of

21

sanctions if responsible, determine responsibility, and advise the student or student organization of the review administrator's recommended sanctions for the alleged violations if found responsible.

(c)     Students or student organizations may elect to have an adviser present who may be consulted with verbally or in writing in a quiet, non-disruptive manner but the advisor may not actively participate as a spokesperson or vocal advocate in the proceeding. Students or student organizations are required to notify the review administrator 24 hours prior to the procedural review if the adviser is an attorney.

(d)     Procedural reviews may be rescheduled at the discretion of the review administrator.

(e)     If a student or student organization fails to appear at the procedural review, the director of the OUJA, may schedule an administrative review committee (ARC) hearing.

(f)     Notwithstanding the provisions above, the director of the OUJA may schedule an ARC without conducting the procedural review.

(iv)     Options for resolution through procedural review

(a) A student or student organization may be found to be not responsible following a procedural review. If a student or student organization is found not responsible, their case will be considered resolved and closed.

(b) If a student or student organization is found to be responsible, then no later than three days from the review administrator's written notice of the recommended sanction, the student or student organization shall notify the review administrator in writing whether the student or student organization:

i.   Accepts responsibility for the violations and agrees to accept the sanctions imposed by the review administrator; or

ii.  Accepts responsibility but disputes the proposed sanction and requests that the sanction be determined by an ARC; or

iii. Does not accept responsibility and requests a hearing

before an ARC.

(c) If the student or student organization fails to notify the review administrator of the option selected within three days of the procedural review, an ARC hearing will be scheduled.

(d) The OUJA encourages students or student organizations charged in the same incident and who choose to have an ARC Hearing, to have their cases consolidated. The OUJA reserves the right to require consolidation of hearings.

(b) Resolution by administrative review committee hearing

(i) Administrative Review Committee members

(a) A pool of members shall be made available to serve on the ARC. This pool shall consist of: five faculty and staff selected by the director of the OUJA in consultation with academic colleges, no fewer than ten student representatives selected by the OUJA in consultation with student government association, and no fewer than four graduate or professional students selected by the OUJA in consultation with the graduate student governance association.

The ARC shall consist of the hearing chair, two faculty or staff selected from the ARC pool, and four undergraduate student representatives selected from the ARC student pool for undergraduate cases or two graduate students selected from the ARC student graduate pool for graduate cases. The ARC will receive at least annual training on issues related to harassment and discrimination as well as annual training on how to conduct the hearing process.

(b) The hearing chair shall be the director of the OUJA or the director's designee.

(c) A quorum is present for undergraduate cases when the hearing chair, one faculty or staff, and three student representatives are present. A quorum is present for graduate cases when the hearing chair one faculty or staff and two student representatives are present. The hearing chair will only vote in the case of a tie by the committee.

(d) The complainant or accused may challenge participation of any committee member on the grounds of conflict of interest. Challenges must be submitted in writing to the hearing chair within three days of notice of the committee

23

composition.  The challenge must specify reasons that would prevent the individual from being unbiased with respect to the hearing proceedings.  The hearing chair shall decide whether the challenge has merit.  If the challenge is granted, a substitute will be appointed and the same option to challenge shall exist.  If the hearing chair is challenged, the dean of students shall determine the validity of the challenge and either replace or retain the hearing chair.

(ii)     Hearing participants

(a)     Presence at hearings shall be restricted to the complainant and accused involved except as otherwise noted.  The ARC hearing shall be closed to the public.

(b)     The complainant and accused may elect to have an adviser present who may consult with the student verbally or in writing in a quiet, non-disruptive manner but the advisor may not actively participate as a spokesperson or vocal advocate in the hearing.  The complainant and the accused are required to notify the hearing committee chair 24 hours prior to the hearing if the adviser is an attorney.  A student or student organization should select an advisor whose schedule allows attendance at the scheduled date and time for the ARC hearing because delays will not normally be allowed due to the scheduling conflicts of an advisor.

(c)     The university ombuds may be present as an observer.

(d)     If either party chooses not to attend the hearing, his or her written statements shall be reviewed and evaluated based on the information available.

(e)     Witnesses are strongly encouraged to be present for hearings. Both parties will be afforded the same opportunities to have witnesses present for hearings. Both parties must disclose to the hearing officer the identity of the witnesses, a summary of what each witness will speak to, and submit any other evidence at least ten (10) calendar days prior to the hearing. The hearing chair will provide a list of the witnesses and any other submitted evidence to the parties generally 5 calendar days prior to the hearing. The hearing chair, in consultation with the ARC, reserves the right to limit the number of witnesses. Witnesses shall be present only when giving testimony.  However, if they are unable to attend, statements may be submitted.

(f)     The hearing chair reserves the right to make appropriate accommodations to secure the safety and comfort of all

24

parties and witnesses during a judicial proceeding.

(g)     If the hearing chair elects to accept a witness's written statement in lieu of in-person testimony, the identity of the witness and his or her statements will be fully disclosed to the other party and they shall be given the opportunity to respond to such statements.

(iii)     Hearing procedures

(a)     Committee hearings shall be recorded by the university. Committee deliberations shall not be recorded. Any record of the hearing shall remain the property of the university. Either party may have post-hearing access to the recorded hearing. However, to maintain confidentiality, students are not permitted an audio copy of the recorded hearing.

(b)     The hearing chair, in consultation with the ARC, shall have the right to determine the acceptability of testimony and other evidence during the hearing, and may place time limitations on testimony and on closing comments.

(c)     The accused and the complainant shall have the right to submit evidence and written questions to be asked of all adverse witnesses who testify in the matter. The hearing chair, in consultation with the ARC, has the right to review and determine which written questions will be asked.

(d)     Both sides shall be given an opportunity to present a closing statement. At the close of the hearing, the ARC shall deliberate privately to determine whether the accused violated the SCOC.

(iv)     Post-hearing procedures

(a)     The ARC will seek to reach consensus in adjudicating cases. In the event there is no consensus, a majority vote will determine the outcome. In the event of tie votes, the hearing chair will render a vote. The parties will receive concurrent written notice of the outcome, consistent with federal and state law.

(b)     The hearing chair shall send the ARC's final recommendation to the dean of students.

(c)     Within three days after receipt of the ARC's recommendations, the dean of students shall provide written notice to the parties, consistent with applicable

25

federal and state laws and the director of the OUJA of the decision to:

(i.)  Concur,

(ii.)  Modify sanction or,

(iii.)   Send back to the ARC for further review and recommendation

    a.  Should a matter be sent back to ARC, the dean of students shall allow an additional ten calendar days for the review.

    b.  Upon receipt from ARC of their finding, the process shall begin again at (c.), above.

    c.  Upon receipt for the second time from the ARC, the Dean of Students will make a final decision to concur or modify recommendations.

(d)  If the student does not appeal a sanction within five days, the sanctions approved by the dean of students shall take effect.

(e)  In complaints involving harassment or discrimination both the Complainant and Respondent have the right to file an appeal.

(f)  Records relating to a disciplinary action are maintained by the director of the OUJA as educational records and are protected by FERPA.

(g)  Victims of crimes of violence or sexual violence, including violent crimes as defined in the section 2901.01 of the Revised Code, will receive concurrent notification of results of the campus disciplinary proceedings.

(5)  Sanctions and interim measures for nonacademic misconduct

(a)  The university may impose interim measures (e.g., cease and desist, restriction from dining halls, residence halls or specific buildings, no contact) to protect the rights and ensure the safety or address the concerns of students, staff, faculty, and the university community.

(b)  Sanctions shall be imposed according to the severity of the misconduct. Multiple sanctions may be imposed should the behavior call for the imposition of a more severe penalty. Remedies also may be provided to the parties or the campus community, as appropriate.

(c)  Implementation of sanctions is immediate or as defined.

26

(d)     Alcohol or drug possession disclosure

   (i)     The University of Cincinnati may notify the parents or guardians of any student who is under the age of 21 and who has been found to be in violation of the SCOC with respect to any federal, state, or local law or university policy governing the use or possession of alcohol or a controlled substance.

   (ii)    Students will receive copies of notification letters sent to their parents or guardians.

   (iii)   The university also reserves the right to make any other parental disclosures as permitted by FERPA.

   (iv)    In complaints involving crimes of violence and sexual violence, the complainant will receive written notification of sanctions that the respondent may receive, consistent with federal and state law.

   (v)     Definitions of disciplinary sanctions include the following:

   (i)     University disciplinary reprimand

           Notifies the student in writing that his or her behavior is unacceptable and that any other violation may warrant further sanctions.

   (ii)    University disciplinary probation

           Imposes specific restrictions or places extra requirements on the student for a specified period. These may vary with each case and may include restrictions related to participation in intercollegiate athletics, extracurricular and residence life activities. Such restrictions may also involve other requirements not academically restrictive in nature. They should be consistent with the philosophy of providing constructive learning experiences as a part of the probation. A student may be required to meet periodically with designated persons. Any further misconduct on the student's part during the period of probation may result in disciplinary suspension or dismissal.

   (iii)   University disciplinary suspension

           Prohibits the student from attending the university and from being present without permission of the director of the OUJA or his or her designee on any university owned, leased, or controlled property for a specified period of time. University disciplinary suspensions shall have effective beginning and ending dates. Students placed on university disciplinary suspension must comply

with all suspension requirements. A student seeking to attend the university after the conclusion of his or her suspension shall first request permission to re-enroll from the OUJA.

(iv)    University disciplinary dismissal

Permanently prohibits the student from attending the university and from being present, without permission, on any university owned, leased, or controlled property.

(v)    Other disciplinary educational sanctions

Sanctions designed to develop the student's behavior include: service to the university or university community; restrictions on the right of access to campus facilities, events, and student organizations; restitution for damage or expenses caused by the misconduct; and referral for psychological or psychiatric evaluation or other educational or developmental programs.

(vi)    Interim suspension

(a)    An interim suspension is an interim action, effective immediately, designed to prohibit the presence of the student or student organization on campus and from participating in any university-related activities, registered student organization activities, and academic coursework until the student's disciplinary case can be resolved in accordance with prescribed disciplinary procedures. Such action shall be taken when the vice president for student affairs and services or his or her designee has reasonable cause to believe that the student's presence on university owned, leased, or controlled property or at a university-related or registered organization activity poses a substantial threat to the health or safety of others or to property. An interim suspension begins immediately upon written notice by the vice president for student affairs and services or designee and restricts a student's physical access to campus if deemed necessary in order to:

(i.)    Maintain order on university property and campuses.

(ii.)    Preserve the orderly functioning of the university and the pursuit of its mission.

(iii.)    Stop interference in any manner with the rights of citizens while on university owned, leased, or controlled property, while on professional practice assignment or while representing the university.

            (iv.)    Stop actions that threaten the health or safety of any person including oneself.

            (v.)    Stop actions that destroy or damage property of the university or of any member of its community.

      (b)    Interim suspension may be imposed pending the application of the disciplinary process. A disciplinary hearing shall be scheduled by the university without undue delay. The student may, within three (3) calendar days of the imposition of the suspension, petition the vice president for student affairs and services for reinstatement. The petition must be in writing, and must include supporting documentation or evidence that the student does not pose, or no longer poses, a significant risk of substantial harm to the health or safety of others or to property. A hearing on such petition will be conducted without undue delay by the vice president for student affairs and services or his or her designee. The purpose of this hearing will be to determine if the interim suspension shall remain in effect, be modified, or be revoked pending a disciplinary hearing. In interim suspension related to harassment or discrimination matters, complainant will be notified of the petition and be provided the opportunity to provide a response. The Complainant will be allowed to participate in any hearing where the Respondent is allowed to participate. The Complainant and Respondent will receive concurrent written notification of the outcome of the hearing. The complainant's role in the interim suspension process may be limited consistent with federal and state laws.

  (6)    Sanctioning of student organizations

      (a)    When a student organization is charged with a violation of the SCOC, it will be referred for action under the SCOC procedures.

      (b)    Student organizations found responsible for violation of SCOC shall be subject to sanctions including termination of university registration, restriction <u>of</u> or suspension of the use of university facilities or services, suspension of the privilege to sponsor activities or events, the loss of university funds, and restitution for damage. Educational sanctions may also be imposed.

(D)    Appeal process

  (1)    Filing an appeal

      (a) A student or student organization found to be responsible for either an

29

academic or nonacademic violation of the SCOC shall have the right to appeal. An appeal must be submitted in writing to the director of the OUJA within five days of receipt of the sanction decision letter. Upon receipt of the appeal, the director of the OUJA will forward the appeal along with the student's file to the University Appeals Administrator (UAA), appointed by the vice president for student affairs and services.

(b) A student or student organization may challenge participation of the UAA on the grounds of conflict of interest. Challenges must be submitted in writing to the director of the OUJA along with the appeal within the five days. The challenge must specify reasons that would prevent the individual from being unbiased with respect to the hearing proceedings. The director of the OUJA, in consultation with the Dean of Students, shall decide whether the challenge has merit. If the challenge is granted or if there is an inherent conflict of interest with the UAA, a substitute will be appointed by the vice president for student affairs and services, and the same option to challenge shall exist.

(c) In appeals involving harassment or discrimination, both the complainant and respondent may challenge participation of the UAA on the grounds of conflict of interest as per the process outlined in (b), above.

(2)  Grounds for appeal. The only permissible grounds for appeal shall be that:

   (a)  New information was discovered, which was not available at the time of the hearing, and such evidence could affect the decision in the case;

   (b)  A substantial procedural error occurred in the process, which affected the decision in the case; or

   (c)  A sanction of suspension or dismissal from the university was imposed and is not commensurate with the violation.

   (d)  In appeals involving crimes of violence or sexual violence, any sanction may be appealed by either the complainant or respondent on the grounds that the sanction is not commensurate with the violation.

(3)  Procedure.

   (a)  The UAA shall review all appeals. All steps in the appeal process shall occur without unnecessary delay.

   (b)  The UAA shall review the appeal for appropriate grounds and shall reject and return to the student any appeal deemed groundless, with a brief written explanation of the reason the appeal was rejected. That decision shall be final.

   (c)  In appeals involving harassment or discrimination, both the Complainant and Respondent will be notified of an appeal that is deemed groundless.

(d)     If the UAA determines that the new information described in the appeal was not available earlier and could affect the decision or that a substantial procedural error occurred in the process which could have affected the decision in the case, the UAA shall charge the ARC or CHP to hold a limited hearing for the sole purpose of reviewing the new information or correcting the procedural error.  The hearing shall be limited in scope.  It shall not include any review of evidence or testimony or modification of factual conclusions reached in the original hearing, unless they are affected by the new information or by the procedural error. The appeal and complete hearing file shall be provided to the ARC or CHP.

(e)     If members of the ARC or CHP, which initially heard the complaint, are not available for continued service, substitute members will be selected by the director of the OUJA from the original pool or by the CCA.  The UAA is not a member of the ARC or CHP and does not participate in the review process.

(f)     Following this limited hearing, the ARC or CHP shall submit a report and possibly a revised recommendation to the UAA.  The UAA shall review the file and recommendation.  If it is the opinion of the UAA that the new evidence was considered or the procedural error corrected, the UAA shall forward the recommendation to the appropriate dean.  If the UAA determines that the ARC or CHP failed to correct the procedural error or failed to consider the new evidence, the UAA shall return the matter to the ARC or CHP with instructions to reconsider.

(g)     For appeals of suspension for academic or non-academic matters based on a claim that the sanction is not commensurate to the violation, the UAA shall review the file and issue a final decision to concur with or modify the sanction, then send the file to the appropriate Dean.

(h)     For appeals of dismissal based on a claim that the sanction is not commensurate to the violation, the UAA shall review the file and issue a final decision to concur with or modify the sanction, then send to file to the appropriate vice president.

(i)     For appeals that a sanction is not commensurate with the offense, the UAA shall review the file and issue a final decision to concur with or modify the sanction, then send the file to the Dean of Students and for sanctions of dismissal to the Vice President for Student Affairs and Services.

(4)     Final Decision

(a) The appropriate vice president or dean shall accept, reject or modify the recommended sanction and notify all parties in writing of the final decision. The final decision rests with: the dean of students for nonacademic misconduct sanctions other than dismissal; the vice president for student

affairs and services for nonacademic misconduct sanctions of dismissal; the college deans for academic misconduct sanctions other than dismissal; the provosts for academic misconduct sanctions of dismissal.

(b) In appeals involving harassment or discrimination, the Complainant and Respondent will receive concurrent notification in writing of the final decision.

Approved by the University of Cincinnati Board of Trustees April 15, 2015.

Published by the Division of Student Affairs and services

Reference University Rule 3361:40-5-05, located in the Langsam Library, Board of Trustees Office, Office of the Vice President for Student Affairs and Services, and college offices.